Lew ANDERTON and Anderton
Development Partnership,
LP, Appellants,

v.

William R. CAWLEY, Individually and as Trustee of the Bill Cawley 1997 Revocable Trust; Cawley–Cascade GP, LLC; Cawley–PB Funding, LP; Cawley Finance, LLC; Cawley Finance II, LLC; Bot Real Estate, LLC; COT Real Estate, LLC; Lonnie A. Eichinger as Trustee of the Christopher Cawley 1998 Irrevocable Trust; Lonnie A. Eichinger as Trustee of the Kelly Cawley 1998 Irrevocable Trust; and Marcus D. Hiles, Appellees.

No. 05–10–00693–CV.

Court of Appeals of Texas, Dallas.

May 8, 2012.

Rehearing Overruled Aug. 28, 2012.

Supplemental Opinion on Motion for Rehearing Aug. 28, 2012.

D. Brent Lemon, Law Office of D. Brent Lemon, Dallas, TX, Edward Slayton Cox, The Cox Law Firm, Bedford, TX, for Appellant.

James Robert Krause and Ryan Lurich, Friedman & Feiger, L.L.P., Kirsten M. Castaneda and Mike A. Hatchell, Locke Lord Bissell & Liddell LLP, Dallas and Austin, TX, for Appellees.

Before Justices MOSELEY, FITZGERALD, and MARTIN RICHTER.

## OPINION

Opinion by Justice FITZGERALD.

Appellant Lew Anderton and appellee William R. Cawley were partners in two partnerships formed for the purpose of developing real estate. Appellants sued appellees, alleging that appellees committed various torts and breaches of contract that ultimately destroyed the value of Anderton's partnership interests. Appellee BOT Real Estate, LLC ("BOT") counterclaimed against Anderton, alleging that he was liable on a personal guaranty. The trial judge disposed of the case by summary judgment, ordering appellants to take nothing on their claims and awarding BOT roughly $8.6 million in damages and prejudgment interest against Anderton. Appellants appealed. We affirm in part, reverse in part, and remand.

## I. Background

### A. Facts

The following facts are taken from the summary-judgment evidence.

#### 1. Genesis of the Cascades Development

In 2002, Anderton and Cawley formed two partnerships in order to develop about 500 acres of land near Bellwood Lake in Tyler, Texas. They formed a partnership called Cascades Properties, Ltd. ("Cascades Ltd.") to develop the part of the land that would be turned into a residential development. Cawley contributed most of the start-up capital for this partnership. Anderton and Cawley formed a separate

partnership called Bellwood Lake Partnership, Ltd. ("Bellwood Ltd.") to acquire and improve an existing golf course that adjoined the intended residential development. The original managing general partner of both Cascades Ltd. and Bellwood Ltd. was Cascade Properties GP Corp., an entity "headed by" Anderton.

During Phase 1 of the development, Cawley told Anderton that the cost of building roads and other infrastructure exceeded his personal financial abilities, and he recommended that Cascades Ltd. borrow additional funds from Park Cities Bank, where Cawley was a 10% shareholder, director, and member of the loan committee. Cawley promised that the Bank would work with the partnership if the development ran into trouble. Anderton consented to Cascades Ltd.'s borrowing $3 million from the Bank in July 2003, which was refinanced into a $5.5 million line of credit in March 2004. Shortly after the partnership obtained the first loan, Cawley told Anderton that the Bank demanded that one of Cawley's companies serve as construction manager on the project. It took Cawley over two years to complete the Phase 1 improvements.

**2. The partnerships borrow additional funds**

Phases 2 and 3 of the development both commenced in 2005. Around this time, Cawley unsuccessfully sought to buy Anderton out of the partnerships. Cawley also told Anderton that he did not intend to put any more money into the development and would not fund the Phase 2 and Phase 3 improvements, or the construction of a planned new clubhouse for the golf course. After Anderton made his own unsuccessful attempt to buy Cawley out, Cawley began to propose various means of raising the capital for Phases 2 and 3. Anderton agreed to allow Cascades Ltd. to borrow $6.5 million from Park Cities Bank

in April 2006 to fund Phase 2 and Phase 3 improvements. Later in 2006, Cawley arranged for the Bank to make a $13.325 million loan to Bellwood Ltd. Most of the loan proceeds—$7.325 million—was put into a CD at the Bank in Cawley's name, to be pledged as collateral for the loan. The rest of the money was to be used to fund part of the construction of a new clubhouse. The record contains a $13.325 million promissory note, made by Bellwood Ltd., signed by Anderton, and dated November 3, 2006. The record also contains Anderton's personal guaranty of that note.

Appellee Marcus D. Hiles became involved in the development in 2006. He was a building contractor. He entered into a joint venture with Cascades Ltd. to build homes and condominiums in the development. Hiles was also hired to build the golf course's clubhouse.

As work on the development continued in 2007, Anderton and Cawley discussed ways to raise the money that would be needed to finish the development. Cawley proposed to have a company that he owned, appellee Cawley–PB Funding, LP ("Cawley–PB Funding"), lend the partnerships $25 million—$15 million in January 2008, and $10 million a few months later. Anderton testified in his summary-judgment affidavit that Cawley made several misrepresentations in connection with this loan. He attested that Cawley misrepresented that Cawley–PB Funding had $25 million available to lend, when in fact Cawley–PB had access to only $15 million of credit from an entity called Palm Beach Multi–Strategy Fund. He also attested that Cawley misrepresented that the full $25 million would be loaned by Cawley–PB Funding, but only $15 million was ever funded. Finally, he attested that Cawley misrepresented that a $1 million fee that was paid to the managers of Palm Beach was a fee for the full $25 million loan,

when it was actually a fee for the managers of Palm Beach to seek out $10 million of financing in addition to the $15 million that was already available. In January 2008, Anderton executed a loan agreement and a $25 million promissory note by Cascades Ltd. in favor of Cawley–PB Funding. The note was secured by a deed of trust on the partnership's real and personal property. Then Cawley–PB Funding assigned its interest in the loan to The Bank of New York Trust Company for the benefit of Palm Beach Multi–Strategy Fund, L.P.

Around the same time that the Cawley–PB Funding loan to Cascades Ltd. closed, Anderton and Cawley executed amended partnership agreements for both Cascades Ltd. and Bellwood Ltd. Also around this time, Park Cities Bank approved a release to Cawley of the $7.325 million CD associated with, and previously pledged as collateral for, the Bank's $13.325 million loan to Bellwood Ltd.

### 3. The partnerships lose all their assets in foreclosures

In 2008, Hiles voiced complaints about Anderton's management of the development, which Anderton attributed to Anderton's attempts to enforce restrictive covenants and minimum building standards in the development. In March 2008, Cawley attempted to exercise his rights under a buy-sell clause in the new Cascades Ltd. partnership agreement. Anderton filed this lawsuit in or about May 2008. On June 17, 2008, Anderton resigned from his position as the principal of the general partner of the two partnerships. Appellee Cawley–Cascade GP, LLC ("Cawley–Cascade"), which was controlled by Cawley, became the general partner of Cascades Ltd.

Anderton and Cawley executed a letter agreement on September 30, 2008, that contemplated the execution of a future settlement agreement to resolve their disputes. In the letter agreement, Anderton acknowledged and agreed that "Cascades does not have the ability to pay upcoming debt service" and that Cawley or his affiliates might need to repurchase the debt then owed ultimately to Palm Beach Multi–Strategy Fund. And in December 2008, Cawley–PB Funding did in fact acquire and become the holder of Cascades Ltd.'s debt.

Anderton testified by affidavit that Cawley misapplied revenues from "Cascade property sales" and caused the loan to go into default at the end of 2008. In February 2009, Cawley, as manager of Cawley–Cascade, made a capital call on the partners of Cascades Ltd., but no contributions were made. On or about February 26, 2009, Cawley–PB Funding gave Cascades Ltd. notice of default and notice of acceleration of the debt. Cawley–PB Funding instigated a foreclosure sale, and in June 2009 it purchased "the Cascade property" by bidding the amount of the outstanding debt on the loan. Thus, Cascades Ltd. was divested of all its assets, destroying the value of Anderton's interest in that partnership.

Anderton also testified by affidavit that Cawley simultaneously orchestrated a scheme to divest Bellwood Ltd. of its assets via the $13.325 million loan from Park Cities Bank. In February 2009, the Bank gave notice that Bellwood Ltd. was in default on the $13.325 million note, both as to interest payments and for failure to pay property taxes for 2008. On June 30, 2009, the Bank paid $114,456.46 to Smith County for Bellwood Ltd.'s 2008 property taxes. The next day, the Bank demanded reimbursement of the $114,456.46 from Bellwood Ltd. and its guarantors and gave notice of its intent to accelerate the entire debt. Several days later, on July 13, the Bank assigned the Bellwood Ltd. note and

related liens and guaranties to BOT, a limited liability company of which Cawley was a manager and which Cawley had created for the purpose of purchasing the Bellwood Ltd. debt. In or about August 2009, BOT foreclosed on Bellwood Ltd.'s collateral. BOT's credit bid was only $4 million, purportedly leaving a deficiency of almost $8.4 million owed by Bellwood Ltd. and guaranteed by Anderton. Anderton contends that this whole sequence of events was fraudulent because the evidence shows that on June 30 BOT secretly paid the Bank the amount of property taxes owed by Bellwood Ltd.

## B. Procedural history

In this lawsuit, commenced in 2008, appellants Anderton and Anderton Development Partnership, LP [1] asserted numerous theories of liability against appellees and others not parties to this appeal. Appellants sued Hiles for defamation and for aiding and abetting breach of fiduciary duty. They sued Cawley individually for breach of fiduciary duty, civil conspiracy, tortious interference, common-law fraud, statutory fraud, and negligent misrepresentation. And they sued the other appellees, in various combinations, for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, civil conspiracy, tortious interference, fraudulent transfer/foreclosure/conversion, and breach of contract. In addition, appellants sought the imposition of a constructive trust with receivership, an accounting, and dissolution of the partnerships. BOT asserted a counterclaim against Anderton on his guaranty of the Bellwood Ltd. loan, seeking to recover the amount of the deficiency remaining after BOT foreclosed on Bellwood Ltd.'s property.

BOT filed a traditional motion for partial summary judgment on its counterclaim against Anderton. On the same day, all of the appellees except for Hiles filed a traditional and no-evidence motion for partial summary judgment attacking all of appellants' causes of action. Appellants filed a combined response to both motions. The summary-judgment movants filed written objections to appellants' response and evidence. After a hearing, the trial judge signed orders granting both motions.

After the judge signed the two summary-judgment orders, appellees (except for Hiles) filed a motion to cancel a notice of lis pendens that Anderton had allegedly filed in Smith County. Anderton opposed the motion.

Hiles then filed his own motion for partial summary judgment on appellants' aiding and abetting claim against him. The trial judge granted that motion. After the remaining claims in the case were nonsuited, the trial judge signed a final judgment. In the judgment, the judge awarded BOT about $8.6 million in damages and prejudgment interest against Anderton. The judge also ordered appellants to take nothing by their claims. The judge further ordered the cancellation of any lis pendens based on appellants' claims in this lawsuit.

Appellants timely appealed and filed an emergency motion for stay of the part of the judgment canceling appellants' lis pendens. We granted the motion and issued an order staying that part of the judgment. Meanwhile, the parties disputed the amount of security that Anderton should be required to post in order to supersede the judgment, and the trial judge eventually signed an order in which he found that Anderton's net worth was $1,890,168.77 and decreed that the necessary amount of security was $945,084.39.

---

1. In their appellate brief, appellants assert that Anderton assigned all of the claims he asserted in this lawsuit to Anderton Development Partnership, LP.

Anderton filed a motion in this Court asking us to reduce that amount. We denied the motion. *Anderton v. Cawley*, 326 S.W.3d 725 (Tex.App.-Dallas 2010, order). Anderton sought mandamus relief from the Texas Supreme Court, which denied his petition. *In re Anderton*, No. 10–0932 (Tex. Nov. 24, 2010).

## II. STANDARD OF REVIEW

Appellants raise five issues on appeal, each challenging some aspect of the trial judge's summary-judgment rulings.

■■■ We review a summary judgment de novo. *Smith v. Deneve*, 285 S.W.3d 904, 909 (Tex.App.-Dallas 2009, no pet.). When we review a summary judgment in favor of a claimant, we determine whether the claimant established every element of its claim as a matter of law. *Ohio Cas. Ins. Co. v. Time Warner Entm't Co.*, 244 S.W.3d 885, 888 (Tex.App.-Dallas 2008, pet. denied). When we review a traditional summary judgment in favor of a defendant, we determine whether the defendant conclusively disproved an element of the claimant's claim or conclusively proved every element of an affirmative defense. *Smith*, 285 S.W.3d at 909. We consider the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in favor of the nonmovant and resolving any doubts against the movant. *Baleares Link Express, S.L. v. GE Engine Servs.-Dallas, LP*, 335 S.W.3d 833, 836 (Tex.App.-Dallas 2011, no pet.). A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence. *In re Estate of Hendler*, 316 S.W.3d 703, 707 (Tex.App.-Dallas 2010, no pet.).

■■■ When we review a no-evidence summary judgment, we inquire whether the nonmovant adduced sufficient evidence to raise a genuine issue of fact on the challenged elements. *Smith*, 285 S.W.3d at 909. "[W]e review the evidence in the light most favorable to the respondent against whom the summary judgment was rendered.... If the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact, a no-evidence summary judgment cannot properly be granted." *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex.2009) (citations omitted). That is, a no-evidence summary judgment should be reversed if the evidence is sufficient for reasonable and fair-minded jurors to differ in their conclusions. *See Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex.2008) (per curiam).

## III. ANALYSIS

### A. BOT's summary judgment on its counterclaim

In appellants' first issue, Anderton argues that the trial judge erred by granting summary judgment for BOT on its counterclaim against Anderton because the evidence raised a genuine fact issue as to an essential element of that counterclaim. We agree.

#### 1. Applicable law and summary of the arguments

■■■ BOT sued Anderton on his guaranty of Bellwood Ltd.'s $13.325 million note to Park Cities Bank. "A guaranty creates a secondary obligation whereby the guarantor promises to answer for the debt of another and may be called upon to perform once the primary obligor has failed to perform." *Dann v. Team Bank*, 788 S.W.2d 182, 183 (Tex.App.-Dallas 1990, no writ). To recover under a guaranty, a claimant must prove (1) the existence and ownership of the guaranty agreement, (2) the terms of the underlying contract by the holder, (3) the occurrence of the conditions upon which liability is based, and (4) the guarantor's failure or refusal to per-

form the promise. *Marshall v. Ford Motor Co.,* 878 S.W.2d 629, 631 (Tex.App.-Dallas 1994, no writ).

Anderton argues that the evidence raised a genuine fact issue on the third element of BOT's claim because there is some evidence that Bellwood Ltd. was not in default when BOT foreclosed on the partnership's property. In its summary-judgment motion, BOT argued that it conclusively proved that Bellwood Ltd. was in default on and after June 30, 2009, for failing to pay its 2008 property taxes. Anderton responded that the evidence showed that BOT itself secretly transferred funds to Park Cities Bank on June 30, 2009, sufficient to pay Bellwood Ltd.'s taxes, thereby curing the partnership's default.

**2. The evidence raises a genuine fact issue as to whether Bellwood Ltd. was in default when BOT foreclosed**

■ In his reply brief, Anderton concedes that it is undisputed that Bellwood Ltd. was in default on its debt for failure to pay its 2008 property taxes up to June 30, 2009. BOT's evidence showed that Bellwood Ltd. had not paid roughly $114,000 of 2008 property taxes as of June 30, 2009, and that Park Cities Bank paid those taxes to the taxing authorities in Smith County on that date. By letter dated July 1, 2009, the Bank notified Bellwood Ltd., Anderton, and the other guarantors that the partnership would be in default if the Bank was not reimbursed for that payment by 3:00 p.m. on July 3. Other evidence filed by BOT indicates that no reimbursement was made by Bellwood Ltd. or the guarantors, and that the Bank assigned the loan, still in default, to BOT on July 13.

■ Next we consider Anderton's summary-judgment evidence. As a threshold matter, BOT argues that we should not consider Anderton's evidence because appellees made written objections to Anderton's evidence and the trial judge "indicated" that he was sustaining those objections. Anderton responds that the trial judge made no written ruling on appellees' objections and that the trial judge's oral statements do not amount to an express or implicit ruling on the objections. *See* TEX.R.APP. P. 33.1(a)(2)(A) (requirement of trial-court ruling to preserve error). BOT contends that the trial judge did rule on the objections, relying on one specific page of the reporter's record from a hearing that took place after the judge had already signed the partial summary judgments at issue. We agree with Anderton that the judge's oral statements do not rise to the level of rulings on appellees' objections. The judge said the following:

> I reviewed the various objections and I felt that—I can't recall each of the objections at this time. . . . But I believe those objections that had merit and supported my actions, I made those determinations. And those that were without merit, that supported my objections [sic], were proper.

The trial judge did not clearly indicate that he was sustaining all of appellees' objections, and in fact the previous page of the reporter's record contains the judge's statement to appellees' counsel that "you probably have some good objections on a few items." Because the trial judge indicated that he considered the objections but did not state which objections he sustained and overruled, we conclude no error was preserved. *Cf. S & I Mgmt., Inc. v. Sungju Choi,* 331 S.W.3d 849, 855 (Tex. App.-Dallas 2011, no pet.) (holding error not preserved even though trial judge said, "Because your [summary-judgment] motions were granted, you can assume that the objections have been granted"); *Stewart v. Sanmina Tex., L.P.,* 156 S.W.3d 198,

206–07 (Tex.App.-Dallas 2005, no pet.) (holding error not preserved, even though summary-judgment order recited "to the extent any summary judgment evidence is mere conclusion or based upon speculation it cannot be considered for purposes of the summary judgment record"). The failure to obtain a sufficient ruling from the trial judge does not waive defects of substance, *DMC Valley Ranch, L.L.C. v. HPSC, Inc.*, 315 S.W.3d 898, 905 (Tex.App.-Dallas 2010, no pet.), but on appeal BOT does not argue that any specific parts of Anderton's affidavit are defective in substance. Instead, BOT provides us with a global reference to its trial-court objections, plus a copy of Anderton's affidavit with all supposedly objectionable parts—the majority of the affidavit—highlighted in yellow without further explanation. We will consider appellants' evidence unless it is plainly conclusory or otherwise defective in substance.

Anderton relies on evidence supporting the following facts. Cawley was a 10% shareholder, director, and member of the loan committee of Park Cities Bank. By letter dated February 20, 2009, the Bank notified Bellwood Ltd., Cawley, and Anderton that Bellwood Ltd. was in default on its $13.325 million promissory note because it had failed to pay interest due and 2008 property taxes. At some point the interest was paid, but Anderton was not told about this payment. Next, an internal Bank memorandum dated March 24, 2009, indicates that the Bellwood Ltd. loan was on a "watch list," that the loan was past due and real-estate taxes were due, and that Cawley was planning to form a new entity to acquire the loan, to "allow him to negotiate with Mr. Anderton." Other evidence indicates that BOT was the entity Cawley formed in order to acquire the Bellwood Ltd. note from the Bank. Also on March 24, 2009, the Bank sent another letter to Bellwood Ltd., Cawley, and Anderton advising that the partnership's note remained past due. Next, Anderton's evidence includes a copy of a June 30, 2009 check by BOT, signed by Cawley and payable to the Bank, in the amount of $114,456.46. The copy also shows the check stub, which reflects that the $114,456.46 figure is the sum of six different line items of different amounts, and that all six line items are labeled "08PropTaxBLP" in a column entitled "Invoice." A redacted image of the copy of the check and check stub follows:

| Ent | Name | Acct No | Invoice | Date | P.O. Num | Reference | Amount | Discount | Net |
|---|---|---|---|---|---|---|---|---|---|
| 6010 | BOT Real Estate | 1144-0000 | 08PropTax8LP | 5/22/2009 | | 10000004500010000 | 2,170.47 | 0.00 | 2,170.47 |
| 6010 | BOT Real Estate | 1144-0000 | 08PropTax8LP | 5/22/2009 | | 10000072700001040 | 257.31 | 0.00 | 257.31 |
| 6010 | BOT Real Estate | 1144-0000 | 08PropTax8LP | 5/22/2009 | | 10000072700005030 | 1,192.46 | 0.00 | 1,192.46 |
| 6010 | BOT Real Estate | 1144-0000 | 08PropTax8LP | 5/22/2009 | | 10000096300054010 | 107,036.30 | 0.00 | 107,036.30 |
| 6010 | BOT Real Estate | 1144-0000 | 08PropTax8LP | 5/22/2009 | | 15000015050000002000 | 3,704.13 | 0.00 | 3,704.13 |
| 6010 | BOT Real Estate | 1144-0000 | 08PropTax8LP | 5/22/2009 | | 16000530000000001000 | 13.77 | 0.00 | 13.77 |

| | | | | | |
|---|---|---|---|---|---|
| Payor: | BOT Real Estate LLC | | Date | Check No. | Check Amount |
| Payee: | Park Cities Bank | | 6/30/2009 | 001012 | 114,456.46 |

*Report the amounts for your records*

**BOT Real Estate LLC**
14735 Preston Road
Suite 850
Dallas, TX 75254

Fidelty Bank
5049 W Park Blvd
Plano, TX 75093

85-2631/1119

| Date | Check No. | Check Amount |
|---|---|---|
| 6/30/2009 | 001012 | $114,456.46 |

========= One Hundred Fourteen Thousand Four Hundred Fifty Six AND 46/100 Dollars =========

Pay to the order of

**Park Cities Bank**

*William R. Cawley*

The Bank did not disclose to Anderton that it had received these funds—the precise amount of taxes owed—from BOT. The same day, June 30, the Bank wrote a $114,456.46 check to the Smith County Tax Office for Bellwood Ltd.'s 2008 property taxes. The Bank's attorney then sent Bellwood Ltd., Cawley, and Anderton a letter dated July 1 stating that the Bank had paid the property taxes and demanding reimbursement by 3:00 p.m. on July 3, failing which the partnership would be in default. According to Anderton, this letter was a fabrication because of BOT's payment to the Bank on June 30. Anderton also filed a copy of an internal Bank document dated August 2009 and entitled "Loan Advance Request Form." Although this document seems to relate primarily to Cascades Ltd. rather than Bellwood Ltd., it includes a page that contains a recitation that "Bellwood Property Taxes" of $114,457 were "Paid to PCB 6/30/09." Anderton concludes that this evidence of BOT's payment to the Bank on June 30 raises a genuine fact issue as whether the partnership's default was cured, and thus whether Anderton actually owed BOT (which later acquired the note) anything under his guaranty.

 Although recent authority is sparse, the applicable rule of law is this: when a third party pays the holder of a note, the transaction is presumed to be a purchase and not a payment and discharge of the note unless evidence shows the parties to the payment intended otherwise. *See Shanks v. First State Bank of Coahoma*, 70 S.W.2d 444, 446 (Tex.Civ.App.-Eastland 1934, no writ) ("[T]he payment for and receipt of a note by a stranger to it, is presumptively a purchase and not a payment of the note."); *see also Eberley v. First Nat'l Bank of Stanton*, 272 S.W.2d 532, 537 (Tex.Civ.App.-Eastland 1954, writ ref'd n.r.e.) ("Where a note is paid by a stranger thereto, it is generally held to be a purchase, not payment, of the note."); *see also Vogel v. Cent. Tex. Sec. Corp.*, 62

S.W.2d 243, 245 (Tex.Civ.App.-Austin 1933, writ ref'd) ("The intention of the parties relative to the discharge of a debt when it is paid by a stranger to the holder either determines whether the debt is discharged or transferred...."). Other jurisdictions have followed a similar rule. *See, e.g., Bradley v. Lehigh Valley R. Co.*, 153 F. 350, 353 (2d Cir.1907) ("Payment of an obligation of another by a third party does not discharge it as between the original parties, unless the payment is made and received with the intention that it shall do so."); *Proctor v. Pyle*, 33 Cal.App.2d 121, 91 P.2d 187, 191 (1939) ("When a note is paid after maturity by a stranger thereto, in the absence of evidence to the contrary, it is presumed the transaction constitutes a purchase of the instrument and not an extinguishment of the obligation."); *Union Trust Corp. v. Fugate*, 172 Va. 82, 200 S.E. 624, 626 (1939) ("Ordinarily, [a payment by a stranger to a note] is to be considered as a purchase, in the absence of anything to show a contrary intention.").[2]

In its appellate brief, BOT argues that the evidence does not raise a genuine issue of material fact because BOT's June 30 payment to the Bank was part of the consideration BOT paid to purchase the partnership's note, not a payment made to cure the partnership's default. But BOT cites no record evidence, aside from the check itself, to support its assertion that the June 30 payment was part of the consideration for BOT's subsequent purchase of the Bellwood Ltd. note. The check and check stub contain no indication that the funds were paid as partial consideration for the purchase.

BOT also relies on the case of *Lavender v. Bunch*, 216 S.W.3d 548 (Tex.App.-Texarkana 2007, no pet.). In that case, four individuals guarantied a corporate note of $80,000. *Id.* at 550. Bunch, who was one of the guarantors, also pledged a $100,000 certificate of deposit to secure the obligation. *Id.* Bunch later purchased the note from the creditor bank, released the certificate of deposit to himself, and sued the other three guarantors on their guaranties. *Id.* Bunch won summary judgment for the full amount of the debt. *Id.* at 551. The court of appeals held that Bunch could not shift his own proportionate liability for 25% of the debt to his co-guarantors, but it otherwise agreed with Bunch that he could acquire the debt, stand in the original creditor's shoes, and, as the written guaranty agreements allowed, release the pledged collateral without affecting the guarantors' liability for the debt. *Id.* at 552–54. Although factually somewhat similar to this case, *Lavender* sheds no light on the question presented. The question in the instant case is whether a jury could reasonably find from the summary-judgment evidence that BOT's June 30 payment of the amount of property taxes due cured the partnership's default and thus was not partial payment towards BOT's purchase of the note. In *Lavender*, by contrast, the appellants apparently did not contend that whatever Bunch paid to acquire the debt was really a payment made for the debtor's benefit. In the instant case, Anderton argues that BOT's payment, which BOT now characterizes as partial payment for the note, cured the debtor's default, so *Lavender* does not help us answer the question of whether Anderton's evidence raises a genuine fact issue

**2.** None of the parties relies on or cites Chapter 3 of the Texas version of the Uniform Commercial Code. We note that the general rule under Chapter 3 is that "an instrument is paid to the extent payment is made *by or on* *behalf of* a party obliged to pay the instrument, and to a person entitled to enforce the instrument." Tex. Bus. & Com.Code Ann. § 3.602(a) (West Supp.2011) (emphasis added).

as to the existence of a default when BOT foreclosed.

We conclude that the evidence raises a genuine issue of material fact on the question of whether BOT's June 30 payment cured Bellwood Ltd.'s default. Under the general rule, we presume that BOT's payment was intended as a purchase of the partnership's obligation unless there is evidence tending to show that BOT and the Bank intended for the payment to discharge the partnership's obligation instead. *See Shanks,* 70 S.W.2d at 446. The following evidence, viewed in the light most favorable to Anderton, raises a genuine fact issue on BOT's and the Bank's intent. BOT's check stub for the June 30 payment says nothing about partial payment for acquisition of the Bellwood Ltd. note and instead referenced only "08Prop-TaxBLP." The check itself was for the exact amount of property taxes that the Bank had been demanding from Bellwood Ltd., and the Bank paid the partnership's property taxes essentially simultaneously with its receipt of BOT's funds. This evidence is some evidence that BOT and the Bank intended the payment to be used to pay the taxes, thus curing Bellwood's Ltd.'s default based on nonpayment of property taxes. Similarly, the Bank's records included an internal document reciting that "Bellwood Property Taxes" were "Paid to PCB 6/30/09," which tends to show that the Bank received the funds with the intention of applying them directly to Bellwood Ltd.'s property taxes, thus curing the partnership's default. Because the evidence raises a reasonable inference that BOT and the Bank intended for BOT's June 30 payment to be on behalf of and for the benefit of Bellwood Ltd., thus curing the partnership's default, the trial judge erred by granting a traditional summary judgment for BOT on its counterclaim against Anderton.

In light of the foregoing, we need not discuss Anderton's alternative argument that BOT's judgment against him was erroneous because the actions of "the Cawley Defendants" leading up to BOT's foreclosure constituted breaches of fiduciary duty, statutory and common-law fraud, and fraudulent transfer/foreclosure/conversion.

We sustain appellants' first issue on appeal. The trial judge erred by granting summary judgment in favor of BOT on its counterclaim.

**B. No-evidence summary judgment on appellants' claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and constructive trust**

In their second issue, appellants contend that the trial judge erred by granting a no-evidence summary judgment against them on their claims against Cawley and Cawley–Cascade for breach of fiduciary duty. They also make similar arguments as to their claims for aiding and abetting breach of fiduciary duty and constructive trust. We agree with appellants.

**1. Breach of fiduciary duty**

■ The elements of a breach-of-fiduciary-duty claim are: (1) a fiduciary relationship existed between the plaintiff and defendant; (2) the defendant breached its fiduciary duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant. *Jones v. Blume,* 196 S.W.3d 440, 447 (Tex. App.-Dallas 2006, pet. denied). Cawley and Cawley–Cascade made no-evidence challenges to the second and third elements of appellants' claims, contending that there was no evidence of a breach of fiduciary duty, no evidence of injury to appellants, and no evidence of benefit to themselves.

### a. Breach

As to the element of breach, appellants' threshold argument is that Cawley and Cawley–Cascade's no-evidence challenge is improper because Cawley and Cawley–Cascade bore the burden of proving that they did not breach their fiduciary duties to Anderton. *See* TEX.R. CIV. P. 166a(i) (limiting no-evidence motions to "elements of a claim or defense on which an adverse party would have the burden of proof at trial"). There is a substantial body of authority that certain transactions involving a fiduciary and its beneficiary are presumed unfair and invalid unless the fiduciary proves that the transactions are fair and reasonable. *See, e.g., Stephens Cnty. Museum, Inc. v. Swenson,* 517 S.W.2d 257, 260 (Tex.1974); *Lee v. Hasson,* 286 S.W.3d 1, 20–21 (Tex.App.-Houston [14th Dist.] 2007, pet. denied); *Miller v. Miller,* 700 S.W.2d 941, 946–47 (Tex.App.-Dallas 1985, writ ref'd n.r.e.). Cawley and Cawley–Cascade contend that their no-evidence challenge was nevertheless proper. They cite *Johnston v. Kruse,* 261 S.W.3d 895, 902–03 (Tex.App.-Dallas 2008, no pet.), in which we affirmed a no-evidence summary judgment as to a claim for breach of fiduciary duty based on the absence of evidence of the element of breach.

 We need not resolve the parties' disagreement about the placement of the burden of proof because we conclude that appellants adduced enough evidence to raise a genuine fact issue as to breach even if they bore the burden of proof on that element. A fiduciary breaches its duty to its beneficiary if it engages in a transaction with its beneficiary that is not fair and equitable, *Miller,* 700 S.W.2d at 947, if it does not make reasonable use of the confidence the beneficiary has placed in it, *id.,* or if it does not make full and complete disclosure of all important information, *Johnson v. Peckham,* 132 Tex. 148, 120 S.W.2d 786, 787 (Tex.1938). Other factors relevant to fairness include whether the beneficiary had the benefit of independent advice, whether the fiduciary benefited at the beneficiary's expense, and whether the fiduciary significantly benefited from the transaction as viewed in light of circumstances existing at the time of the transaction. *Lee,* 286 S.W.3d at 21; *Gaynier v. Ginsberg,* 715 S.W.2d 749, 754 (Tex. App.-Dallas 1986, writ ref'd n.r.e.). Appellants' evidence raises a genuine fact issue as to breach.

One aspect of appellants' fiduciary-duty claim is that Cawley obtained control of Cascades Ltd., caused the partnership to default on loans owed to an entity controlled by Cawley, and foreclosed on Cascades Ltd.'s assets to take those assets for himself and destroy the value of Anderton's partnership interest. Anderton swore to the following facts in his affidavit. Cawley made misrepresentations in order to persuade Anderton to cause Cascades Ltd. to borrow $25 million from appellee Cawley–PB Funding, a Cawley-controlled entity, in or around January 2008. The money actually came from Palm Beach Multi Strategy Fund, and only $15 million of that amount was actually funded. Cawley–PB Funding assigned the note and deed of trust to Palm Beach,[3] but the note and deed of trust were eventually released back to Cawley–PB Funding, LP. In mid–2008, Anderton resigned from his management position in the partnership, and Cawley took over the management through his control of Cawley–Cascade, the general partner of Cascades Ltd. Cawley then diverted over $600,000 in partnership reve-

---

**3.** According to Cawley's affidavit, Cawley–PB Funding, LP actually assigned its interest in the loan to The Bank of New York Trust Company, N.A., for the benefit of Palm Beach Multi–Strategy Fund, L.P.

nues to other expenses rather than loan repayments. As a result, the loan went into default. Cawley made a capital call in February 2009 for purposes of making a $600,000 installment payment on the debt, but neither he nor the trusts he controlled made a capital contribution. Cawley–PB Funding then relied on the $600,000 default as grounds to foreclose on Cascades Ltd.'s property in June 2009. Cawley–PB Funding relied on its $14 million outstanding loan to acquire property that had been appraised for over $76 million less than two years earlier.

From the above facts stated in Anderton's affidavit, we conclude that reasonable, fair-minded jurors could differ as to whether Cawley and Cawley–Cascade breached their fiduciary duties to Anderton. The affidavit supports the proposition that Cawley and Cawley–Cascade purposefully conducted the business of Cascades Ltd. so as to trigger a default and permit a different Cawley entity to acquire all of Cascades Ltd.'s assets at a discount through foreclosure. A reasonable juror could conclude that Cawley and Cawley–Cascade did not make reasonable use of the confidence Anderton placed in them as his partners, and that Cawley benefited at the expense of his partner Anderton. Our conclusion is supported by the decision in *Kunz v. Huddleston,* 546 S.W.2d 685 (Tex.Civ.App.-El Paso 1977, writ ref'd n.r.e.). In that case, a partner in a partnership used a separate corporation to acquire the partnership's debts without notice to the other partner, and then foreclosed on the partnership's property. *Id.* at 687. The court of civil appeals upheld the jury's finding that this conduct amounted to a breach of the fiduciary duty the defendant owed to his partner. *Id.* at 689; *see also Gulsby Eng'g, Inc. v. Gallagher,* No. 01–87–00853–CV, 1988 WL 86333 (Tex.App.-Houston [1st Dist.] Aug. 18, 1988, no writ) (not desig-

nated for publication) (upholding jury finding that partner breached fiduciary duty by causing partnership to incur debts to partner's separate enterprise and then foreclosing on those debts).

Cawley and Cawley–Cascade's arguments in support of the summary judgment are not persuasive. They argue that Anderton himself caused Cascades Ltd. to borrow the funds from Cawley–PB Funding, that he consented to Cawley–PB Funding's reacquisition of the debt from Palm Beach Multi Strategy Fund, and that Anderton stipulated at the time of that reacquisition that Cascades Ltd. lacked the funds to pay debt service. Even if these facts are true, they do not conclusively refute Anderton's evidence that Cawley and Cawley–Cascade diverted Cascades Ltd.'s revenues from debt service to expenses so as to cause a default and thereby destroy the value of Anderton's partnership interest. A reasonable factfinder could find from the evidence that Cawley and Cawley–Cascade's course of conduct was unfair and inequitable to Anderton.

Cawley and Cawley–Cascade also argue that appellants' evidence does not raise a fact issue because the evidence proves only conduct within a statutory "safe harbor" that allows a partner to "lend money to and transact other business with the partnership" and that further provides, "[s]ubject to other applicable law, a partner has the same rights and obligations with respect to those matters as a person who is not a partner." TEX. BUS. ORGS.CODE ANN. § 154.201 (West 2011) (codifying applicable provisions formerly found in the Texas Revised Partnership Act and the Texas Revised Limited Partnership Act). But as appellants point out, this provision is subject to "other applicable law," which would include the special duties that partners owe each other. And appellants do not claim that Cawley and Cawley–Cascade

breached their fiduciary duty merely by making, buying, or enforcing a loan, but by deliberately and unfairly managing the partnership so as to cause a default and foreclosure, to Cawley's ultimate benefit and Anderton's detriment. Section 154.201 and its predecessors do not vitiate appellants' summary-judgment evidence of breach of fiduciary duty.

The no-evidence summary judgment on appellants' claims against Cawley and Cawley–Cascade for breach of fiduciary duty cannot be sustained on the element of breach.

#### b. Injury to appellants

█ Cawley and Cawley–Cascade also moved for summary judgment on the ground that appellants could produce no evidence of injury to themselves or benefit to Cawley and Cawley–Cascade. The evidence discussed in the preceding section of this opinion includes evidence that Cawley's and Cawley–Cascade's breaches of fiduciary duty caused Cascades Ltd. to lose all of its property in foreclosure. The evidence further tends to show that, in this foreclosure, Cawley–PB Funding acquired property that had been appraised for over $76 million less than two years earlier for only $14 million. A reasonable juror could infer that this harmed the value of Anderton's interest in Cascades Ltd., benefited Cawley and Cawley–Cascade, or both. The evidence thus raises a genuine fact issue as to the third element of appellants' breach-of-fiduciary-duty claims, and the no-evidence summary judgment cannot be sustained on the element of damages.

#### 2. Aiding, abetting, and constructive trust

Appellants sued several of the Cawley appellees for aiding and abetting Cawley's and Cawley–Cascade's alleged breaches of fiduciary duty. Most of those appellees joined in a no-evidence summary-judgment attack on those claims. Specifically, those movants were Cawley in his capacity as trustee of the Bill Cawley 1997 Revocable Trust, Cawley–PB Funding, Lonnie A. Eichinger in his capacities as trustee of the Christopher Cawley 1998 Irrevocable Trust and the Kelly Cawley 1998 Irrevocable Trust, BOT, COT Real Estate, LLC ("COT"), Cawley Finance, LLC, and Cawley Finance II, LLC. They moved for and obtained summary judgment on the ground that appellants could produce no evidence that a fiduciary duty was breached or caused damages. They, and Cawley individually, sought and obtained summary judgment on appellants' claims for a constructive trust on the same ground.

█ We have already concluded that appellants raised a genuine issue of material fact on the disputed elements of their claims for breach of fiduciary duty. Accordingly, the trial judge erred by granting the above-listed appellees a no-evidence summary judgment on appellants' claims for aiding and abetting breach of fiduciary duty and for constructive trust.[4]

#### 3. Conclusion

We sustain appellants' second issue on appeal. The trial judge erred by granting the above-referenced Cawley appellees' no-evidence motion for summary judgment as to appellants' claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and constructive trust.

---

[4.] A constructive trust is actually an equitable remedy, not an independent cause of action. *Beverly Found. v. Lynch,* 301 S.W.3d 734, 736 (Tex.App.-Amarillo 2009, no pet.); *see also* *Smith v. Deneve,* 285 S.W.3d 904, 910–11 (Tex.App.-Dallas 2009, no pet.) ("A constructive trust is an equitable remedy imposed to prevent unjust enrichment.").

## C. Traditional and other no-evidence grounds for summary judgment on appellants' claims against the Cawley appellees

In their third and fourth issues on appeal, appellants globally challenge all other grounds for summary judgment on their claims against the Cawley appellees (that is, all of the appellees except for Marcus D. Hiles). We address appellants' arguments on a claim-by-claim basis.

### 1. Breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and constructive trust

The Cawley appellees sought a traditional summary judgment on these claims, but their motion is not clear as to the elements that they attempted to negate or the affirmative defenses that they attempted to establish. After reviewing the motion, we conclude that the Cawley appellees attacked the element of breach, which is common to all of these theories of liability, and also relied on an affirmative defense of release or waiver, based on a letter agreement signed by Anderton.

The Cawley appellees argue that we should affirm the traditional summary judgment on these claims because in their appellate brief appellants attack only the no-evidence summary judgment on those claims. We disagree. Appellants' third and fourth issues on appeal challenged the Cawley appellees' traditional summary judgment. Although appellants' argument focuses largely on the no-evidence summary judgment, their argument that their evidence sufficed to raise a fact issue on the element of breach is equally applicable to the Cawley appellees' traditional summary judgment attacking that element. Thus, we conclude that appellants adequately attacked the traditional summary judgment on these claims.

The Cawley appellees argued that they refuted the element of breach by proving the following facts: Anderton consented to allowing Cawley–PB Funding acquire Cascades Ltd.'s debt from Palm Beach Multi Strategy Fund; Anderton agreed that Cascades Ltd. could not pay its debt service; Cawley–PB Funding was not a fiduciary to Cascades Ltd.; and Cawley–PB Funding was legally entitled to enforce its loan rights against Cascades Ltd. We have already discussed appellant's controverting evidence, from which a reasonable factfinder could find that Cawley operated Cascades Ltd. in such a way as to trigger a default on its debt to Cawley–PB Funding, thereby entitling the latter to foreclose on all of Cascades Ltd.'s property and to destroy the value of Anderton's interest in the partnership. A reasonable factfinder could further conclude that this course of conduct was unfair, inequitable, and amounted to a breach of Cawley's fiduciary duty to Anderton. Thus, we cannot sustain the Cawley appellees' traditional summary judgment on the theory that they conclusively negated the element of breach.

Next we consider whether the Cawley appellees were entitled to traditional summary judgment on these claims because of Anderton's consent to the letter agreement of September 30, 2008. Paragraph 13 of that agreement included the following provision: "[Anderton] acknowledges and agrees that because Cascades does not have the ability to pay upcoming debt service, that Cawley or one of his affiliates may need to purchase the [Palm Beach] note and/or other obligations of the Cascades, and [Anderton] covenants not to sue anyone based upon those future transactions." Appellants argue that the covenant not to sue is limited to claims arising from Cawley's or his affiliates' acquisition of Cascades Ltd.'s debt, and that their fiduciary-duty claims are not based on the

mere acquisition of that debt. We agree with appellants. By its own terms, the covenant is limited to suits based upon Cawley's or his affiliates' purchase of Cascades Ltd.'s debt. Appellants adduced evidence of distinct breaches of fiduciary duty after that acquisition, including evidence that Cawley unfairly diverted partnership revenues away from debt service so as to trigger a default and foreclosure.

We conclude that the trial judge erred to the extent he relied on the foregoing grounds in granting traditional summary judgment as to appellants' claims against the Cawley appellees for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and constructive trust.

**2. Statutory fraud and common-law fraud**

Appellants sued only Cawley in his individual capacity for statutory fraud and common-law fraud. Cawley obtained a no-evidence summary judgment on both claims. Cawley also obtained a traditional summary judgment on both claims based on the statute of limitations. We consider the no-evidence points first.

**a. No evidence of common-law fraud**

 As to common-law fraud, appellants' argument on appeal does not comport with their summary-judgment response in the trial court. In their live pleading in the trial court, appellants based their fraud claims on "false representations" and "false promises" by Cawley. They did not allege fraud by nondisclosure, a subspecies of fraud that requires proof of a duty of disclosure. *See Bright v. Addison,* 171 S.W.3d 588, 599 (Tex.App.-Dallas 2005, pet. dism'd, pet. denied) (discussing fraud by nondisclosure). In his no-evidence motion for summary judgment, Cawley relied on the ordinary elements of fraud by misrepresentation, which are "(1) the defendant made a mate-

rial representation; (2) the representation was false; (3) when the defendant made the representation, he knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the defendant made the representation with the intent that the plaintiff should act on it; (5) the plaintiff acted in reliance on the representation; and (6) the plaintiff thereby suffered injury." *Baleares Link Express, S.L. v. GE Engine Servs.-Dallas, LP,* 335 S.W.3d 833, 839 (Tex.App.-Dallas 2011, no pet.). Cawley made no-evidence challenges to all of these elements. In their summary-judgment response, appellants did not indicate that their fraud claim was based on fraud by nondisclosure. On appeal, however, appellants do not argue the elements of fraud by misrepresentation; instead, they argue only that they raised a genuine fact issue as to every element of fraud by nondisclosure.

Because appellants' summary-judgment response did not include any argument that Cawley's no-evidence motion for summary judgment should be denied because appellants' fraud claim was also a fraud-by-nondisclosure claim, appellants failed to preserve their argument for appeal. *See* Tex.R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); *see also Pinnacle Anesthesia Consultants, P.A. v. Fisher,* 309 S.W.3d 93, 105 (Tex.App.-Dallas 2009, pet. denied) (applying Rule 166a(c)). We will not disturb the no-evidence summary judgment on appellant's common-law fraud claims against Cawley.

**b. No evidence of statutory fraud**

The elements of statutory fraud are (1) a transaction involving real estate or stock; (2) the defendant made a false representation of a past or existing material fact, or

made a false and material promise to do an act with the intention of not fulfilling it; (3) the false representation or promise was made for the purpose of inducing the claimant to enter into a contract; (4) the plaintiff relied on the false representation or promise in entering into the contract. TEX. BUS. & COM.CODE ANN. § 27.01(a) (West 2009); *Coldwell Banker Whiteside Assocs. v. Ryan Equity Partners, Ltd.*, 181 S.W.3d 879, 888 (Tex.App.-Dallas 2006, no pet.). Alternatively, the claimant can prove statutory fraud in a real-estate transaction by proving (1) the defendant had actual awareness of the falsity of a third party's representation or promise; (2) the defendant failed to disclose that falsity to the claimant; and (3) the defendant benefited from the third party's false representation or promise. TEX. BUS. & COM.CODE ANN. § 27.01(d); *1994 Land Fund II v. Ramur, Inc.*, No. 05–98–00074–CV, 2001 WL 92696, at *6 (Tex.App.-Dallas Feb. 5, 2001, no pet.) (not designated for publication). Cawley raised no-evidence grounds attacking every element of § 27.01(a) statutory fraud and also attacking the second and third elements of § 27.01(d) statutory fraud.

■ On appeal, appellants limit their arguments to the second and third elements of § 27.01(d) statutory fraud only, and they fail to address the Cawley appellees' no-evidence challenge to the threshold element, that the fraud occurred "in a transaction involving real estate or stock in a corporation or joint stock company." TEX. BUS. & COM.CODE ANN. § 27.01(a).[5] Because appellants do not challenge every ground on which the no-evidence summary judgment could have been granted on their statutory-fraud claims, we must affirm the judgment as to those claims. *See Jarvis v. Rocanville Corp.*, 298 S.W.3d 305, 313

(Tex.App.-Dallas 2009, pet. denied); *see also Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex.1970).

We will not disturb the no-evidence summary judgment on appellants' claims for statutory fraud against Cawley.

### c. Conclusion

Appellants failed to preserve their appellate argument attacking the no-evidence summary judgment against appellants on their common-law fraud claims. And they did not challenge every ground on which the trial judge could have granted a no-evidence summary judgment against them on their statutory-fraud claims.

### 3. Negligent misrepresentation and fraudulent transfer

■ Appellants sued only Cawley in his individual capacity for negligent misrepresentation. Cawley obtained a no-evidence summary judgment on appellants' negligent-misrepresentation claims. Cawley also obtained a traditional summary judgment based on the statute of limitations.

In their appellants' brief, appellants include no argument or authorities specifically addressing the elements of their negligent-misrepresentation claims. Thus, they have waived their issues on appeal to the extent their issues concern those claims. *See Jarvis*, 298 S.W.3d at 313; *Adams v. First Nat'l Bank of Bells/Savoy*, 154 S.W.3d 859, 875 (Tex.App.-Dallas 2005, no pet.).

■ Appellants sued the following Cawley appellees for "fraudulent transfer/foreclosure/conversion": Cawley in his capacity as trustee of the Bill Cawley 1997 Revocable Trust, Lonnie A. Eichinger in his capacities as trustee of the Christopher

---

5. The Cawley appellees argue that the transactions complained of did not involve real

estate but only the transfer of Bellwood Ltd.'s and Cascades Ltd.'s notes.

Cawley 1998 Irrevocable Trust and the Kelly Cawley 1998 Irrevocable Trust, BOT, COT, Cawley Finance, LLC, and Cawley Finance II, LLC. These appellees obtained a no-evidence summary judgment on these claims. Appellants mention the claims in their appellate brief, but they include no substantive argument and cite no authorities relating to these claims. Thus, they have waived their issues on appeal as to those claims as well. *See Jarvis*, 298 S.W.3d at 313.

### 4. Tortious interference

■ Appellants sued the following Cawley appellees for tortious interference with existing and prospective contracts and business relationships: Cawley individually and in his capacity as trustee of the Bill Cawley 1997 Revocable Trust, Cawley–Cascade, Cawley–PB Funding, Lonnie A. Eichinger in his capacities as trustee of the Christopher Cawley 1998 Irrevocable Trust and the Kelly Cawley 1998 Irrevocable Trust, BOT, COT, Cawley Finance, LLC, and Cawley Finance II, LLC. These appellees sought and obtained a no-evidence summary judgment on these claims, attacking every element of each claim.

■ The elements of tortious interference with an existing contract are (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the claimant's injury, and (4) caused actual damages or loss. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex.2000). To support the first element, appellants rely on Anderton's affidavit, in which he testified, "I agreed to carry operational expense shortfalls of Cascade in exchange for Cascade agreeing to pay me commissions of 6% on the sales of properties in the development." To support the second element, appellants rely on the September

30, 2008 letter agreement between Cawley and Anderton, which contains the statement, "Lew [Anderton] will be paid 100% of the commissions currently being held by Cascades (approximately $133,000.00) immediately upon signing this agreement." Appellants also point to Cawley's own summary-judgment affidavit, which shows that he had become managing partner by and through Cawley–Cascade in or about June 2008.

We first note that, on its face, appellants' evidence does not raise a genuine fact issue on the second element of tortious interference with an existing contract against most of the Cawley appellees. That is, appellants' evidence does not tend to show a wilful and intentional act of interference by Cawley–PB Funding, Lonnie A. Eichinger in his trustee capacities, or any of the other appellees except arguably Cawley and Cawley–Cascade. The other Cawley appellees simply are not implicated by appellants' evidence, so the summary judgment was proper as to them.

We further conclude that the evidence does not raise a genuine fact issue on the second element of the claim as to Cawley (in any capacity) or as to Cawley–Cascade. The gist of the evidence is that Cascades Ltd. breached an agreement to pay commissions to Anderton, and Cawley through Cawley–Cascade committed tortious interference by causing Cascades Ltd. to commit that breach. But when a plaintiff contends that an agent (Cawley–Cascade) has committed tortious interference with its principal's (Cascades Ltd.'s) contract, the plaintiff must also prove that the agent (Cawley–Cascade) acted willfully or intentionally to serve its personal interests at the expense of the principal (Cascades Ltd.). *See Morgan Stanley & Co. v. Tex. Oil Co.*, 958 S.W.2d 178, 178 (Tex.1997); *Holloway v. Skinner*, 898 S.W.2d 793, 798 (Tex.1995). The claimant "must prove the

agent acted solely in furtherance of [his or her] personal interests so as to preserve the logically necessary rule that a party cannot tortiously interfere with its own contract." *Latch v. Gratty, Inc.,* 107 S.W.3d 543, 545 (Tex.2003) (per curiam) (internal quotations and citation omitted). Appellants point to no evidence that the alleged withholding of commissions was done solely in furtherance of Cawley's interests or those of Cawley–Cascade at the expense of Cascades Ltd. Accordingly, the evidence cited by appellants constitutes no evidence that Cawley or Cawley–Cascade committed the second element of tortious interference with contract.

■■■ To prove a cause of action for tortious interference with a prospective contract, a claimant must establish the following elements: "(1) a reasonable probability that the parties would have entered into a business relationship; (2) an intentional, malicious intervention or an independently tortious or unlawful act performed by the defendant with a conscious desire to prevent the relationship from occurring or with knowledge that the interference was certain or substantially likely to occur as a result of its conduct; (3) a lack of privilege or justification for the defendant's actions; and (4) actual harm or damages suffered by the plaintiff as a result of the defendant's interference, i.e., the defendant's actions prevented the relationship from occurring." *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.,* 300 S.W.3d 348, 367 (Tex.App.-Dallas 2009, pet. denied). As to the first element, appellants argue that they adduced some evidence that there was a reasonable probability that Anderton would have continued to earn commissions in the future under his agreement with Cascades Ltd. but for the Cawley appellees' interference. As to the second element, appellants argue that Cawley

breached a fiduciary duty to Anderton by causing Cascades Ltd. not to pay Anderton commissions.

We reject appellants' arguments about tortious interference with prospective contractual relationships for much the same reasons we rejected their arguments about tortious interference with contract. Their evidence does not concern any of the Cawley appellees except for Cawley and Cawley–Cascade. And as to those defendants, appellants were obliged to adduce some evidence that Cawley and Cawley–Cascade committed the allegedly interfering conduct willfully or intentionally to serve their own interests rather than the interests of their principal, Cascades Ltd. *See Morgan Stanley,* 958 S.W.2d at 178. Appellants failed to do so.

The trial judge properly granted summary judgment as to appellants' claims for tortious interference with contract and tortious interference with prospective contractual relations.

### 5. Breach of contract

Appellants sued the following Cawley appellees for breach of contract: Cawley in his capacity as trustee of the Bill Cawley 1997 Revocable Trust, Cawley–PB Funding, Lonnie A. Eichinger in his capacities as trustee of the Christopher Cawley 1998 Irrevocable Trust and the Kelly Cawley 1998 Irrevocable Trust, BOT, and Cawley–Cascade. These defendants sought and obtained a no-evidence summary judgment on appellants' breach-of-contract claims, contending that there was no evidence that they breached a contract or that any breach of contract caused any damages.

■■■ The elements of breach of contract are "(1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by

the plaintiff as a result of that breach." *Petras v. Criswell,* 248 S.W.3d 471, 477 (Tex.App.-Dallas 2008, no pet.). Appellants argue that they adduced evidence of two breaches of contract. The first alleged breach was Cascades Ltd.'s failure to pay Anderton certain commissions. Anderton again relies on his summary-judgment affidavit, in which he testified, "I agreed to carry operational expense shortfalls of Cascade in exchange for Cascade agreeing to pay me commissions of 6% on the sales of properties in the development." But this is no evidence that any of the Cawley appellees breached a contract. At most it is evidence that Cascades Ltd. breached a contract, and although Cascades Ltd. was a defendant in the trial court, appellants have not pursued any remedy against Cascades Ltd. on appeal. Thus, the evidence does not show that the Cawley appellees breached the commissions agreement. *See Esty v. Beal Bank S.S.B.,* 298 S.W.3d 280, 299 (Tex.App.-Dallas 2009, no pet.) ("A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform."); *C & C Partners v. Sun Exploration & Prod. Co.,* 783 S.W.2d 707, 721 (Tex.App.-Dallas 1989, writ denied) ("The plaintiff has the burden of proving that the defendant has obligated himself under the contract . . . ."), *disapproved in part on other grounds by Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex. 1998).

Appellants' only other argument as to breach of contract is the bare assertion, without further explanation or citation to the record, that "there was a breach by the Cawley Defendants when BOT wrongfully foreclosed on the Bellwood Note that was not in default." We conclude the assertion is inadequately briefed. Although appellants provide sufficient briefing and argumentation as to BOT's counterclaim

against Anderton for breach of his guaranty, which we have already discussed above, appellants do not brief the elements of their breach-of-contract claim against BOT or the other defendants, nor do they discuss how the summary-judgment evidence raises a fact issue as to these elements. Thus, appellants' bare assertion that the BOT foreclosure constituted a breach of contract "by the Cawley Defendants" presents nothing for us to review. *See In re B.A.B.,* 124 S.W.3d 417, 420 (Tex.App.-Dallas 2004, no pet.).

The trial judge properly granted summary judgment as to appellants' claims for breach of contract.

### 6. Civil conspiracy

█ Appellants sued the following Cawley appellees for civil conspiracy: Cawley individually and in his capacity as trustee of the Bill Cawley 1997 Revocable Trust, Cawley–PB Funding, Lonnie A. Eichinger in his capacity as trustee of the Christopher Cawley 1998 Irrevocable Trust, BOT, COT, Cawley–Cascade, Cawley Finance, LLC, and Cawley Finance II, LLC. These appellees sought and obtained a no-evidence summary judgment on appellants' civil-conspiracy claims, challenging several elements.

█ The elements of civil conspiracy are (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result. *Tri v. J.T.T.,* 162 S.W.3d 552, 556 (Tex.2005). The object to be accomplished must be either an unlawful purpose or a lawful purpose to be achieved by unlawful means. *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 675 (Tex.1998). Moreover, the parties "must be aware of the harm or wrongful conduct at the inception of the combination or agreement." *Triplex Commc'ns, Inc. v.*

*Riley,* 900 S.W.2d 716, 719 (Tex.1995); *see also Crescendo Invs., Inc. v. Brice,* 61 S.W.3d 465, 473 (Tex.App.-San Antonio 2001, pet. denied) ("The meeting of the minds requirement requires knowledge of the course of action and specific intent."). The Cawley appellees who were sued for civil conspiracy challenged elements (2)-(5) in their no-evidence motion for summary judgment. On appeal, appellants argue that their evidence relating to BOT's foreclosure on Bellwood Ltd.'s property raises genuine fact issues on all challenged elements of civil conspiracy. At the outset, we note that appellants' arguments on appeal address only Cawley and BOT, so we will not disturb the judgment as to the other Cawley appellees who moved for summary judgment on civil conspiracy. *See Plotkin v. Joekel,* 304 S.W.3d 455, 467 (Tex.App.-Houston [1st Dist.] 2009, pet. denied) (affirming summary judgment as to claims not addressed on appeal).

We consider each of the challenged elements as to Cawley and BOT. The first challenged element is an object to be accomplished, which must be either an unlawful purpose or a lawful purpose to be achieved by unlawful means. *See Triplex Commc'ns, Inc.,* 900 S.W.2d at 719. Appellants argue that the object to be accomplished by conspirators Cawley, BOT, and Park Cities Bank was the divestiture of the partnerships of all their assets, leaving Anderton with no compensation for his half interests in those partnerships. We conclude there is enough evidence of this element to raise a genuine fact issue, because the evidence supports the proposition that Cawley and the Bank orchestrated BOT's secret payment of Bellwood Ltd.'s property taxes to the Bank without any notice to Anderton. A reasonable person could infer that the purpose of the secrecy was to prevent Anderton from taking any action to protect his interests, keeping the way clear for BOT's foreclosure on Bellwood

Ltd.'s assets. The evidence supports the proposition that the failure to disclose was a breach of Cawley's fiduciary duty to Anderton, making the object an unlawful purpose or a lawful purpose by unlawful means.

Appellees argue that there was no evidence of an improper object to be accomplished because BOT was entitled to enforce its rights in the Bellwood Ltd. note. Thus, appellees argue, there was no unlawful purpose, nor was there the use of unlawful means because it was lawful for BOT to enforce its rights through foreclosure and pursuit of a deficiency judgment against Anderton. We disagree with this analysis because it disregards the evidence of Cawley's agreement with the Bank to accomplish the foreclosure through a breach of his fiduciary duty of full disclosure to Anderton. A reasonable juror could conclude that Cawley's failure to disclose rendered the goal of foreclosure on Bellwood Ltd.'s assets an unlawful purpose or a lawful purpose to be achieved by unlawful means.

The next challenged element is whether Cawley, BOT, and the Bank had a meeting of the minds on their object. We conclude there was enough evidence of this element to raise a genuine fact issue. In particular, the evidence includes the internal Bank memorandum of March 24, 2009, in which a Bank employee states an "action plan" whereby the Bellwood Ltd. note "will be purchased by a new entity formed by Mr. Cawley. This will allow him to negotiate with Mr. Anderton." The evidence shows that the Bank simultaneously sent Bellwood Ltd. a letter demanding payment and threatening foreclosure. And other evidence shows that the Bank continued to assert that Bellwood Ltd. was in default after BOT paid the amount of property taxes owing. This is sufficient evidence for a reasonable person to conclude that

Cawley, BOT, and the Bank had reached a meeting of the minds to work together to achieve a foreclosure of the Bellwood Ltd. note in breach of Cawley's fiduciary duty to Anderton.

The next challenged element is one or more unlawful, overt acts. There was enough evidence of this element to raise a genuine fact issue. We base this conclusion on the evidence that BOT secretly paid Bellwood Ltd.'s property taxes to the Bank, which then paid the taxing authority, and the evidence that Cawley did not inform Anderton of this payment, which could be found to be a violation of Cawley's fiduciary duty to Anderton. Finally, there is enough evidence of damages as a proximate result to raise a genuine fact issue. Appellants adduced some evidence that BOT's foreclosure divested Bellwood Ltd. of its assets, leaving Anderton with a worthless partnership interest in Bellwood, Ltd.

Appellees argue that the summary judgment on civil conspiracy was proper based on the principle that a corporation and its agents constitute a single entity that cannot conspire with itself. *Cf. Crouch v. Trinque*, 262 S.W.3d 417, 426–27 (Tex. App.-Eastland 2008, no pet.) (discussing the principle that a corporation cannot conspire with itself). But this amounts to an attack on the first element of civil conspiracy, which requires the involvement of two or more persons. *See Tri*, 162 S.W.3d at 556. Appellees did not attack the first element of civil conspiracy in their summary-judgment motion, so we cannot consider this argument on appeal. *See El Dorado Motors, Inc. v. Koch*, 168 S.W.3d 360, 364 (Tex.App.-Dallas 2005, no pet.) ("A motion for summary judgment must itself expressly present the grounds upon which it is made and must stand or fall on those grounds alone.").

We conclude the trial judge erred by granting summary judgment against appellants on their civil-conspiracy claims against Cawley and BOT. Appellants have not shown error in the summary judgment on their civil-conspiracy claims against the other appellees.

### 7. Affirmative defenses

In their traditional motion for summary judgment, the Cawley appellees asserted the statute of frauds, the parol evidence rule, and release or waiver based on the covenant not to sue found in the September 30, 2008 letter agreement as affirmative defenses to some of appellants' claims. They did not seek a traditional summary judgment as to appellants' claims for civil conspiracy, so our analysis of these affirmative defenses has no effect on those claims. We have already concluded that summary judgment was proper as to the rest of appellants' claims against the Cawley appellees except for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and constructive trust. Accordingly, we address the Cawley appellees' affirmative defenses as to those claims only.

We have already concluded that the September 30, 2008 letter agreement and the covenant not to sue found therein do not bar appellants' claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and constructive trust. *See supra* Part III.C.1. With respect to the statute of frauds, the Cawley appellees relied on the rule that a contract for the sale of real estate or for a lease of real estate for a term longer than one year is unenforceable unless the agreement is in writing and signed by the person to be charged with the agreement. *See generally* TEX. BUS & COM.CODE ANN. § 26.01 (West 2009). The Cawley appellees' motion for summary judgment summarizes that "the Loan Agreements involve real estate, were

in writing, and signed by Anderton. Thus, the statute of frauds bars *many* of Anderton's claims." (Emphasis added.) However, their motion never explains which of appellants' claims they contended were barred by the statute of frauds, nor how the statute of frauds affected appellants' fiduciary-duty-based claims. Their brief provides no additional light. We have held that the statute of frauds is not a defense to an action for damages for breach of fiduciary duty. *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 461 (Tex.App.-Dallas 1988), *writ denied*, 778 S.W.2d 865 (Tex. 1989) (per curiam). We conclude that the Cawley appellees did not show themselves entitled to summary judgment on appellants' fiduciary-duty-based claims based on the statute of frauds.

■■■ We reach the same conclusions with respect to the parol evidence rule. The parol evidence rule provides that when parties have a valid, integrated agreement, evidence of prior or contemporaneous agreements may not be considered unless an exception to the rule applies. *See Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex.2011) ("The parol evidence rule applies when parties have a valid, integrated written agreement, and precludes enforcement of prior or contemporaneous agreements."); *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 451 (Tex. 2008) (discussing the collateral-and-consistent exception to the parol evidence rule). The Cawley appellees' motion for summary judgment asserts the general proposition that "[t]he parol evidence rule prohibits consideration of extrinsic evidence to contradict, vary, or add to the terms of an unambiguous written agreement unless there has been fraud, accident, or mistake." It then complains about appellants' pleadings, stating that they contain "statements designed to explain the 'intent' of

the parties in negotiating and signing [documents]," or discussing "the parties' prior negotiations leading up to the signing of the Partnership and Loan Agreements." It concludes that "the Court should not consider any alleged parol evidence used . . . to contradict, vary, or add to the terms of the unambiguous Agreements."

Again, however, the Cawley appellees did not explain why the parol evidence rule barred appellants' fiduciary-duty-based claims. As we have held, appellants raised a genuine fact issue on the fiduciary-duty claims with evidence that Cawley unfairly operated Cascades Ltd. in such a way as to trigger a default and cause the partnership to lose all its property in a foreclosure sale to a Cawley-related entity. The Cawley appellees have not shown that the parol evidence rule bars appellants' breach-of-fiduciary-duty claims.

We conclude that the Cawley appellees' affirmative defenses were not proper bases for summary judgment on appellants' claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and constructive trust.

### 8. Conclusion

We agree with appellants' third and fourth issues in part. The trial judge erred by granting summary judgment in favor of the Cawley appellees on appellants' claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, constructive trust, and, as to Cawley and BOT only, civil conspiracy. Otherwise, we reject appellants' contentions under their third and fourth issues.

### D. Summary judgment in favor of appellee Hiles

In their fifth and final issue on appeal, appellants contend that the trial judge erred by granting summary judgment in favor of appellee Marcus D. Hiles on ap-

pellants' claim for aiding and abetting breach of fiduciary duty. We agree with appellants.

Appellants sued Hiles for aiding and abetting Cawley's and Cawley–Cascade's alleged breaches of fiduciary duty. After the trial judge granted partial summary judgment in favor of the Cawley defendants, Hiles filed his own motion for partial summary judgment on appellants' claims against him for aiding and abetting breach of fiduciary duty. Hiles's sole basis for summary judgment on those claims was the summary judgment in favor of the Cawley defendants on appellants' fiduciary-duty claims. We have already concluded· that the trial judge's summary judgment disposing of appellants' fiduciary-duty claims against the Cawley defendants was erroneous. Because Hiles's summary judgment stands or falls with the Cawley defendants' summary judgment on appellants' claims for breach of fiduciary duty, we further conclude that the trial judge erred by granting Hiles's motion for partial summary judgment.

### IV. Disposition

We reverse the trial court's judgment in part and remand the cause to the trial court for further proceedings with respect to the following claims: (1) BOT's counterclaim against Anderton on his guaranty; (2) appellants' claims for breach of fiduciary duty against Cawley–Cascade and against Cawley individually and in his capacity as trustee of the Bill Cawley 1997 Revocable Trust; (3) appellants' claims for aiding and abetting breach of fiduciary duty against Cawley in his capacity as trustee of the Bill Cawley 1997 Revocable Trust, Cawley–Cascade, BOT, COT, Cawley Finance, LLC, Cawley Finance II, LLC, Cawley–PB Funding, Lonnie A. Eichinger as trustee of the Christopher Cawley 1998 Irrevocable Trust, Lonnie A. Eichinger as trustee of the Kelly Cawley 1998 Irrevocable Trust, and Marcus D. Hiles; (4) appellants' claims for constructive trust against Cawley individually and in his capacity as trustee of the Bill Cawley 1997 Revocable Trust, Cawley–Cascade, BOT, COT, Cawley Finance, LLC, Cawley Finance II, LLC, Lonnie A. Eichinger as trustee of the Christopher Cawley 1998 Irrevocable Trust, and Lonnie A. Eichinger as trustee of the Kelley Cawley 1998 Irrevocable Trust; and (5) appellants' claims for civil conspiracy against Cawley individually and BOT. We also reverse the portion of the trial court's judgment cancelling any lis pendens filed based on appellants' claims in this lawsuit. We affirm the trial court's judgment in all other respects.

### SUPPLEMENTAL OPINION ON MOTION FOR REHEARING

Appellees filed a motion for rehearing. We deny the motion with the following comments.

BOT now argues that its summary-judgment evidence conclusively established that Park Cities Bank and BOT intended that BOT's June 30, 2009 payment would not cure Bellwood's default by nonpayment of property taxes. In support, BGOT points out that the document by which the Bank assigned Bellwood's debt to BOT contains a warranty by the Bank that Bellwood owed the Bank not only about $12.3 million in principal but also $114,456.46 in reimbursement of the sum advanced by the Bank to pay Bellwood's property taxes. BOT also relies on the Bank's continued demands on Bellwood after BOT made the June 30 payment and on the affidavit of Brian Neitzel that Bellwood did not reimburse the Bank for the payment.

Although BOT's evidence on its face arguably tends to show that the Bank and BOT did not intend for BOT's payment to

cure Bellwood's default, the test on summary judgment is whether the movant conclusively established its right to relief. *See Ohio Cas. Ins. Co. v. Time Warner Entm't Co.*, 244 S.W.3d 885, 888 (Tex.App.-Dallas 2008, pet. denied). We cannot weigh the evidence. *See Cox v. Upjohn Co.*, 913 S.W.2d 225, 228 (Tex.App.-Dallas 1995, no writ) ("The trial court's duty is to determine if there are any material fact issues to try, not to weigh the evidence or determine its credibility and try the case on affidavits."). As recounted in our opinion, Anderton adduced sufficient evidence that BOT's payment to the Bank cured Bellwood's default to raise a genuine fact issue. Accordingly, summary judgment in favor of BOT on its counterclaim was improper.

Appellees' motion for rehearing is denied.