**Opinion issued December 3, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00256-CV

———————————

**ROBERT HORRY SPORTS MEDICINE, LLC, KEGIS SMITH, KEITH & KERNARD HOLDINGS, LLC, AND ANASTASIA PATOKA, Appellants**

**V.**

**TOMUR BARNES, Appellee**

---

**On Appeal from the 61st District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-69540**

---

## MEMORANDUM OPINION

Appellee, Tomur Barnes, invested $100,000 in a business venture with appellants, Robert Horry Sports Medicine, LLC, Kegis Smith, Keith & Kernard Holdings, LLC, and Anastasia Patoka. When he did not receive a return on his investment, Barnes sued the appellants, asserting causes of action for fraud and

breach of fiduciary duty. A jury found in favor of Barnes on his claims, and the trial court rendered judgment on the jury verdict, awarding Barnes $500,000 in actual damages and a total of $350,000 in exemplary damages against appellees Smith, Patoka, and Keith & Kernard Holdings. The appellants now complain on appeal that (1) Barnes's claims were barred by the statute of limitations; (2) the evidence was insufficient to support the jury's finding that Smith breached a fiduciary duty to Barnes; (3) the evidence was insufficient to support the jury's findings on Barnes's fraud claims; (4) the evidence was insufficient to support the jury's award of actual damages; and (5) the award of exemplary damages was improper. We affirm.

## Background

Tomur Barnes is a retired professional football player who eventually began a second career as an entrepreneur and a personal trainer. Barnes met Anastasia Patoka at the gym, and she informed him of an opportunity to invest in a physical rehabilitation center associated with former Houston Rockets star Robert Horry. According to Barnes, Patoka was looking for other athletes to invest in the business. Barnes told one of his training clients, Roxanne Calmelet,[1] about this opportunity, and they became interested in making an investment.

---

[1] Calmelet was named as a plaintiff in the lawsuit below, but she was not a party to the final judgment.

Around the time Barnes met Patoka, she and Kegis Smith had recently decided to start a physical rehabilitation center. Smith had been friends with Robert Horry for a number of years, and he and Patoka believed that they could create a successful rehabilitation center using Horry's name to promote the business and attract clients. Smith started Robert Horry Center for Sports & Physical Rehabilitation, LLC (Robert Horry Center) and Keith & Kernard Holdings, LLC (K&K Holdings). Patoka and Smith both stated that the purpose of the holding company was to protect them from liability associated with the Robert Horry Center, and they testified that K&K Holdings had a profit-sharing arrangement with the Robert Horry Center. Although Smith, Patoka, and Horry were all listed as owners of the Robert Horry Center, Horry was not involved in business operations, and Patoka and Smith served as the officers and managers of that business. Smith and Horry were the sole members of K&K Holdings.

Barnes testified that, after he met Patoka sometime in late 2010 or early 2011, they began discussing his making an investment in her business with Smith. Barnes toured the physical rehabilitation center in Sugar Land, Texas, which had opened in June 2011. According to Barnes, Patoka and Smith only discussed with him the Robert Horry Center, and he believed that was the entity in which he would be investing. Smith and Patoka told him they were looking to expand beyond the one location that had already opened, and Barnes had connections in

3

Baytown. They told him that he would receive a 12% share in the business in exchange for making a $100,000 investment. Calmelet loaned Barnes $100,000 to invest in the business, and Barnes delivered the funds to Patoka and Smith.

Barnes testified that he did not hear anything further about his investment for months. At some point later in 2011, Barnes received a written agreement from "the Members of Keith & Kernard Holdings, LLC," reciting that Barnes had received a 12% interest in K&K Holdings, while Kegis maintained a 37.9% interest and Horry maintained a 50.1% interest. This agreement was dated October 7, 2011, and was signed by Smith and Horry.[2] This document reflected that Barnes had invested in K&K Holdings, not in the Robert Horry Center as he had believed at the time he delivered the funds to Patoka and Smith. Barnes stated that, at the time this agreement was presented to him, he had never heard of K&K Holdings. He testified, however, that Smith and Patoka represented to him that K&K Holdings was a holding company that owned the entirety of the Robert Horry Center, and, on that basis, he signed the agreement and continued to think that his investment went to the Robert Horry Center and that he would be entitled to those profits through the holding company. He testified that he would not have signed this agreement if he had not believed Patoka's and Smith's representations about the nature of K&K Holdings' interest in the Robert Horry Center.

---

[2]   Horry testified at trial that he did not actually sign the membership agreement, but Smith had signed on his behalf and with his permission.

Barnes testified that, following his investment, he made efforts to coordinate with Patoka and Smith to open a new location of the Robert Horry Center in Baytown, where Barnes lived, but those efforts fell through. Barnes testified that he did not hear anything else from Smith, Patoka, or Horry. He became concerned about his investment and, after doing a little searching on his own, he hired an attorney to help him protect his investment.

Barnes subsequently discovered that sometime in 2012, the Robert Horry Center had become a department of University General Hospital (UGH). Patoka testified at trial that the Robert Horry Center got "into a relationship with the University General Hospital" and that the business "became a department of University General Hospital" with the expectation that UGH would help with billing and collection. Patoka stated that the Robert Horry Center was not sold to UGH, nor did UGH pay to acquire the Robert Horry Center. Rather, UGH "bought some of the equipment and then we had a profit-sharing agreement with them." As part of this arrangement, the Robert Horry Center separated into two different entities—the "Robert Horry Center for Sports and Physical Rehabilitation" and the "Robert Horry Center for Sports and Rehab"—because Smith and Patoka wanted to continue taking referrals from some doctors with whom UGH would not work. Despite the existence of two different entities, Patoka testified that they did the same work in the same facilities and were essentially the same company.

The arrangement between the Robert Horry Center and UGH continued for a "a couple of years" until UGH filed for bankruptcy. Patoka could not recall the exact date that the Robert Horry Center ceased working with UGH, but she knew that UGH ultimately ended up owing Robert Horry Centers a "substantial amount of money." She believed it was approximately $600,000. She testified that this put Robert Horry Centers into a difficult financial position.

Also in 2012, Patoka and Smith married, and Patoka was made a member of K&K Holdings. Patoka could not recall the exact date that she became a member of K&K Holdings. She believed there was "paperwork involved," but she did not have the documents, and she acknowledged that she had not seen the documents filed in connection with the litigation. She testified that she owned a 3% interest in K&K Holdings, which was taken from Smith's ownership interest.

The Franchise Tax Public Information Report for the year 2012 listed Horry, Smith, and Patoka as members and directors of K&K Holdings, but it made no mention of Barnes's interest.

In 2013, Calmelet took action to secure protection for the loan she had made to Barnes that permitted him to invest in K&K Holdings. In a letter dated April 30, 2013, counsel for Calmelet informed the Robert Horry Center and K&K Holdings that she had secured an interest in Barnes's 12% interest in K&K Holdings.

In 2015, Smith and Patoka formed the entity "Robert Horry Sports Medicine, LLC." Patoka testified that Robert Horry Sports Medicine is a different company than the Robert Horry Center in that it does not provide physical therapy services. Robert Horry Sports Medicine is "a referral company. So, it's a VIP scheduling and referral company. We refer patients to see orthopedists. We also refer them for physical therapy."

Upon realizing that he had not been informed about these changes involving the business, Barnes filed suit in 2016. He alleged causes of action for fraud and breach of fiduciary duty, among others, against Robert Horry Sports Medicine and K&K Holdings and against Smith and Patoka individually.[3]

At trial, Barnes testified to the circumstances surrounding his investment with the Robert Horry Center and K&K Holdings. He never received profit/loss statements or other information regarding either K&K Holdings or the Robert Horry Center. He stated that he was not informed about the addition of new members to K&K Holdings, and he was not notified about any changes at the Robert Horry Center. He never received any return on his investment.

Patoka contradicted Barnes's testimony that he was not made aware of changes that occurred at the Robert Horry Center. She testified that she told Barnes

---

[3] Barnes also sued Robert Horry, individually, but the trial court ultimately granted a directed verdict on the fraud claim against Horry, individually, and a judgment notwithstanding the verdict on the breach of fiduciary duty claim against Horry. Thus, he was not a party to the final judgment, and he is not a party to this appeal.

about "the possibility [of the UGH deal] prior to the happening." She stated that she talked to him regularly and that "we always had informal meetings for Keith & Kernard and we informed him. And then when it happened, we also informed him and when it was dissolved, he also knew about that."

Patoka testified that K&K Holdings was entitled to receive 15% of the profits for the Robert Horry Center and the rest of the profits "stay in the Robert Horry Center for Sports and Rehabilitation." She testified that when she asked Barnes to invest, she "always said to him that there was a holding company that owned the percentage and that's where the investment opportunity was." She stated that Barnes "was aware" that he would be given 12% of a 15% interest in the physical therapy centers when he made his investment. She acknowledged that Barnes toured the physical therapy center in Sugar Land, but she testified that she and Smith always told Barnes that the investment was actually through K&K Holdings. However, Patoka could not recall whether any documents were given to Barnes that provided these details, stating, "I don't recall a document. I recall conversations":

> [Barnes]: Can you point us to any document that shows that Keith & Kernard Holdings only owns 15 percent of the Robert Horry Physical Therapy Center?
>
> [Patoka]: I don't see a document here to point you to.
>
> [Barnes]: You've never seen such a document, have you?

[Patoka]: I've seen the company structure, but that's not the document that you produced today.

[Barnes]: You've seen what?

[Patoka]: There's not a document that you produced today that is the structure that I explained to Mr. Barnes but that is not a structure that—I don't see it here today. I'm very confused about your question.

[Barnes]: So there is a document. Are you saying that there is a document that shows that Keith & Kernard Holdings only owns 15 percent?

[Patoka]: To the best of my recollection, I'm saying that I don't see the document here. You keep asking me for a document that I don't have right now.

[Barnes]: No, I'm asking you as a member of Keith & Kernard Holdings and as someone who runs these physical therapy centers if you've ever seen such a document?

[Patoka]: Yes, there's a document that says Keith & Kernard owns 15 percent.

Patoka acknowledged that Barnes invested $100,000, and she testified that part of the money Barnes invested "was going to be used to start working on the project in Baytown" and the remainder went to "operations." Regarding profit and loss statements and other financial information that would have allowed Barnes to follow the progress of the business in which she had invested, she testified that she was not aware that he ever asked for such information. Counsel asked, "Who prepares the profit and loss statements for Robert Horry Sports and Rehab Centers?" She stated that "[i]t depends on what purpose they're being used for. I'm

9

not quite sure." She testified that they were generally prepared by an outside accounting firm. She testified that she managed the daily operations at the Robert Horry Center and that she and Smith were the only two people associated with the business who could request profit and loss statements. Patoka further testified that she and Smith were the only managers of the business and controlled all of the expenditures and other business decisions. She testified that they know what the profits of the company are by looking "at our business accounts."

Barnes questioned her about various expenses and income:

[Barnes]:   Don't you know what the management fee is of Robert Horry Sports and Rehab Center?

[Patoka]:   I don't recall the exact numbers, sir.

[Barnes]:   If there's a management fee being paid of $670,303, does that sound accurate with what your recollection is for the management fee from January to December 2015?

[Patoka]:   I don't recall the exact numbers.

. . . .

[Barnes]:   Do you recall if the total income for January through December of 2015 for the Robert Horry Sport and Rehab Center was $830,661?

[Patoka]:   I don't recall the exact number for that period, sir.

[Barnes]:   Does it sound fairly accurate?

[Patoka]:   I said I don't recall, sir.

[Barnes]:   You just have no idea as you sit here?

[Patoka]: I cannot speak to exact numbers.

[Barnes]: You run this business and you have no idea how much money it made in 2015?

[Patoka]: I do not recall the exact number, sir.

[Barnes]: Do you have an estimate?

[Patoka]: No, I do not have an estimate.

[Barnes]: Not even an estimate and you're one of two people that run this operation?

[Patoka]: That was in 2015, sir. I cannot recall that exact number.

[Barnes]: What's your best guess as to how much money that Robert Horry Sport Center made?

[Patoka]: I don't have a best guess, sir.

[Barnes]: You don't even have that?

[Patoka]: No.

Patoka was similarly unable to provide any information regarding the profit for 2016 and 2017, nor was she able to provide a "year-to-date number for the profit and loss" leading up to trial. Barnes asked whether, as "one of two people that manage the operation," she had any idea how the business was doing, and she stated: "I know the business is trying to become profitable. It has not become profitable. I know that we work really hard, our employees work really hard, we have good patients, the doors are open."

Smith also testified at trial, similarly to Patoka. He testified that the Robert Horry Center had not made any profits, and, thus, none of the investors in K&K Holdings, including him and Patoka, had been paid anything. He could not provide details regarding income or expenses for the time after Barnes's investment in October 2011 until the time of trial in October 2018, but he did testify as follows:

[Barnes]: So how is the business doing presently to year-to-date this year?

[Smith]: I'm not exactly sure about the dollar amount, but we're definitely behind in bills.

[Barnes]: [W]ho keeps that information there at the physical therapy centers? My understanding is only you and Ms. Patoka are the managers but neither one of you know how much money the entity is making.

[Smith]: How much money we're actually making?

[Barnes]: Yes, sir.

[Smith]: We're probably—I can give you an average of monthly right now we're probably averaging thirty, $45,000 a month on average. Some months can be more. Some months could be very less, a lot less.

He further testified that he was "still investing" in the physical therapy centers, and that he worked for the center as a manager. He also acknowledged that both he and Patoka, his wife, take a salary from the Robert Horry Center in exchange for the work they perform as managers, but he could not recall exact amounts.

Regarding providing financial information to Barnes, Smith testified that he recalled a meeting that had taken place sometime in 2016, after Barnes had

12

obtained counsel to help him regarding his investment. Smith testified that he was informed after the 2016 meeting that Barnes was requesting financial information, but he could not recall that any information was ever provided to Barnes. Smith testified that Barnes never requested any financial information directly from him, and he stated that he and Patoka spoke with Barnes regularly.

Smith testified that the $100,000 invested by Barnes was spent by the Robert Horry Center. He "wrote a check from that account [as a deposit] on a lease space in Baytown that Mr. Barnes had found himself." They worked to get a center opened in Baytown, but those efforts were never successful. Smith testified that approximately $30,000 of Barnes's investment was spent on the Baytown venture that proved ultimately unsuccessful. The remainder of Barnes's investment "went into the operations of the Robert Horry Rehab Center."

Smith and Patoka both testified that Barnes was still, at the time of trial, an owner of 12% of K&K Holdings, and none of the investors in K&K Holdings had received a return on their investment. They both believed that the company might still be profitable at some time in the future, and they hoped to see increased revenues in the future.

The appellants moved for directed verdict at the close of evidence. Patoka and Smith moved for a directed verdict on the individual claims filed against them on the grounds that Barnes provided no evidence that either of them breached a

fiduciary duty or committed fraud. The appellants also sought a directed verdict with regard to Robert Horry Sports Medicine LLC, arguing that it "is not a company that was involved in this case" and it "had nothing to do with any of the claims or any of the people in this case regarding the plaintiffs." The appellants also urged a directed verdict based on statute of limitations. The trial court denied the motion for directed verdict on these grounds.

During the charge conference, the appellants' only objection to the charge was to the question regarding damages in the event the jury found in favor of Barnes on the claims of fraud or breach of fiduciary duty. The damages question asked the jury to assess damages for fraud and breach of fiduciary duty in terms of Barnes's "lost profits sustained in the past" and "lost profits that, in reasonable probability, will be sustained in the future." The appellants asserted that the "lost profits should be taken [out] because there's no evidence of lost profits." They did not provide an alternative measure of damages for fraud or breach of fiduciary duty. The trial court overruled the objection.

The jury found that the appellants, K&K Holdings, Robert Horry Sports Medicine, LLC, Smith, and Patoka we liable for fraud, and it found that Smith was liable for breach of fiduciary duty. The jury awarded Barnes $500,000 in actual damages against all appellants jointly and severally, and it awarded Barnes $350,000 total in exemplary damages from K&K Holdings, Smith, and Patoka.

14

The trial court rendered judgment based on the jury's verdict, and this appeal followed.

## Statute of Limitations

In their first issue, the appellants assert that Barnes's claims for fraud and breach of fiduciary duty were time-barred.

The statute of limitations for both fraud and breach of fiduciary duty causes of action is four years after the cause of action accrues. TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(4), (5); *Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 139 (Tex. 2019). The statute of limitations is an affirmative defense, and the appellants bore the burden to plead, prove, and secure findings to support their affirmative defense. *See* TEX. R. CIV. P. 94; *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988) (affirmative defense of limitations must be proven by asserting party); *Thomas v. California Golden Coast, LLC*, No. 01-15-01046-CV, 2017 WL 2117540, at *3 (Tex. App.—Houston [1st Dist.] May 16, 2017, ); *Holland v. Lovelace*, 352 S.W.3d 777, 788 (Tex. App.—Dallas 2011, pet. denied). This burden includes establishing when the plaintiff's cause of action accrued. *Thomas*, 2017 WL 2117540, at *3. If the jury is not asked to determine when the cause of action accrued for purposes of supporting a limitations defense, the defense is waived unless the date of accrual was conclusively established under the evidence. *Id.*

15

Generally, "[c]auses of action accrue and statutes of limitation begin to run when facts come into existence that authorize a claimant to seek a judicial remedy." *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015) (quoting *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 202 (Tex. 2011)). However, "a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run," and so "fraud prevents the running of the statute of limitations until it is discovered, or by the exercise of reasonable diligence might have been discovered." *Id.* Likewise, a breach of fiduciary duty claim accrues "when the claimant knows, or in the exercise of ordinary diligence should know, of the wrongful act and resulting injury." *Williard Law Firm, L.P. v. Sewell*, 464 S.W.3d 747, 752 (Tex. App.— Houston [14th Dist.] 2015, no pet.). While the date a cause of action accrues is normally a question of law, "reasonable diligence is an issue of fact." *Hooks*, 457 S.W.3d at 57–58 (citing *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 623 (Tex. 2011) (per curiam), and *Estate of Stonecipher v. Estate of Butts*, 591 S.W.2d 806, 809 (Tex. 1979)); *see also Wheeler v. Methodist Hosp.*, 95 S.W.3d 628, 637 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding that when plaintiff discovers or should have discovered cause of injury and whether particular plaintiff exercised due diligence in so discovering his injury are fact questions).

16

The appellants argue that Barnes's claims for fraud and breach of fiduciary duty accrued as a matter of law in October 2011, when he signed the written agreement from "the Members of Keith & Kernard Holding, LLC," reciting that Barnes had received a 12% interest in K&K Holdings. This argument disregards the nature of Barnes's claims. Barnes alleged in his petition that, at the time he made the investment in K&K Holdings, it was represented to him that K&K Holdings was the sole owner of the Robert Horry Center and that he would be paid with earnings from the center. At trial, Barnes testified that Smith and Patoka misrepresented the relationship between the Robert Horry Center and K&K Holdings. Barnes testified that Smith and Patoka led him to believe that K&K Holdings was a holding company that was entitled to the profits from the Robert Horry Center. Based on their representation, Barnes believed that his interest in K&K Holdings nevertheless entitled him to 12% of the profits earned by the Robert Horry Center. Smith and Patoka both testified at trial, however, that K&K Holdings was only entitled to 15% of the Robert Horry Center's profits, and Barnes was entitled to only 12% of K&K Holdings' interest, or 1.8% of the profits from the Robert Horry Center. While Smith and Patoka both testified that they made this arrangement clear to Barnes at the time he made his investment, they could not point to any documentation setting out the nature of the relationship between the Robert Horry Center and K&K Holdings.

The appellants further argue that Barnes's breach of fiduciary duty claims are time-barred because they are "based on the same alleged misrepresentations, that were known to Barnes when he executed the investment agreement on October 7, 2011." This, again, misconstrues the nature of Barnes's claims and testimony. Barnes's petition asserted that, after his investment, the appellants breached their fiduciary duties to him by failing to deal in good faith, fairness, and honesty in matters pertaining to the enterprise, in failing to fully disclose all matters affecting the company, and in failing to account for all profits and property, among other breaches. Barnes testified that, even after he signed the investment agreement in October 2011, he continued to believe he was a member of K&K Holdings and that his membership entitled him to profits from the Robert Horry Center. Despite this interest, he was not provided with information regarding the performance of the companies, nor was he informed regarding major changes to the business, such as the addition of new members, structural changes in the Robert Horry Center, and the arrangement with UGH. Even at trial, neither Smith nor Patoka provided information regarding the profits and losses of the Robert Horry Center, beyond making general statements that it had not been profitable and that none of the investors through K&K Holdings had ever seen a return on their investment. They testified that the Robert Horry Center brought in money every month, and they

18

acknowledged that they had been paid salaries for their work managing the center, but they did not provide any specific information about the business's finances.

In light of Barnes's testimony that he was never informed of the limited nature of his right to future profits and his testimony regarding the ongoing concerns with how business was conducted, we cannot conclude that the appellants conclusively established when Barnes knew, or in the exercise of ordinary diligence should have known, of the fraud and breach of fiduciary duty claims. *See Hooks*, 457 S.W.3d at 57; *Sewell*, 464 S.W.3d at 752. Because the appellants failed to prove the accrual of these causes of action as a matter law, and because they failed to ask the jury to determine when the causes of action accrued for purposes of supporting the limitations defense, the defense is waived. *See Thomas*, 2017 WL 2117540, at *3.

We overrule the appellants' first issue.

## Sufficiency of the Evidence

In their second, third, and fourth issues, the appellants assert that the evidence was legally and factually insufficient to support certain jury findings.

### A.    Standard of Review

In a legal sufficiency review, we consider the evidence in a light most favorable to the jury's findings, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City*

*of Keller*, 168 S.W.3d 802, 827 (Tex. 2005); *Republic Petroleum, LLC v. Dynamic Offshore Res. NS LLC*, 474 S.W.3d 424, 433 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). A party that challenges the legal sufficiency of a finding on which it did not have the burden of proof must show that no evidence supports the jury's finding. *Emerald Oil*, 348 S.W.3d at 215; *Republic Petroleum*, 474 S.W.3d at 433. We defer to the jury's determination of the credibility of the witnesses and the weight to accord their testimony. *City of Keller*, 168 S.W.3d at 819; *Republic Petroleum*, 474 S.W.3d at 433.

In a factual sufficiency review, we consider all the evidence in the record in a neutral light and set aside the jury's verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Republic Petroleum*, 474 S.W.3d at 433. Jurors are entitled to resolve inconsistencies in witness testimony, whether those inconsistencies result from the contradictory accounts of multiple witnesses or from internal contradictions in the testimony of a single witness. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *Republic Petroleum*, 474 S.W.3d at 433.

**B.      Breach of Fiduciary Duty Finding Against Kegis Smith**

In their second issue, the appellants argue that the evidence was legally and factually insufficient to support the finding that Kegis Smith breached a fiduciary duty owed to Barnes.

The unobjected-to charge stated:

Did [Smith] comply with [his] fiduciary duty to Tomur Barnes? As fellow members of Keith & Kernard Holdings, LLC, [Smith] owed Tomur Barnes a fiduciary duty. To prove [he] complied with [his] duty, [Smith] must show—

1. The transaction in question was fair and equitable to Tomur Barnes; and

2. [He] made reasonable use of the confidence that Tomur Barnes placed in them; and

3. [He] acted in the utmost good faith and exercised the most scrupulous honesty toward Tomur Barnes; and

4. [He] placed the interest of Tomur Barnes before [his] own, did not use the advantage of [his] position to gain any benefit for [himself] at the expense of Tomur Barnes, and did not place [himself] in any position where [his] self-interest might conflict with [his] obligations as fiduciar[y]; and

5. [He] fully and fairly disclosed all important information to Tomur Barnes concerning the transaction.

*See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge."). The jury found that Smith breached his fiduciary duty to Barnes.

21

At trial, Barnes testified that after he made his investment, he worked for a time with Smith to open a center in Baytown. Those efforts fell through, and Barnes did not receive any other information regarding his investment. He testified that he did not receive profit and loss statements or other financial information from either K&K Holdings or the Robert Horry Center. He testified that he was not informed regarding changes in membership in K&K Holdings, nor was he informed of the Robert Horry Center's relationship with UGH. Furthermore, both Smith and Patoka, as representatives of K&K Holdings and the Robert Horry Center, testified that the center had income from seeing patients, but this income never resulted in any profits. Despite this lack of profitability, Smith and Patoka testified that they both received salaries from the Robert Horry Center for their work managing that business. And neither Smith nor Patoka could provide any specific financial information, despite being aware that at least beginning in 2016 Barnes had obtained counsel in an effort to understand what had become of his $100,000 investment.

This is evidence that the jury could have credited in determining, as instructed in the charge, that Smith did not act with "utmost good faith" and "most scrupulous honesty" toward Barnes, that Smith used the advantage of his position in both companies to gain financial and business benefits at Barnes's expense and placed himself in a position in which his self-interest might conflict with his

fiduciary obligations and that Smith failed to "fully and fairly disclose[] all important information" to Barnes. *See Anderton v. Cawley*, 378 S.W.3d 38, 52 (Tex. App.—Dallas 2012, no pet.) (discussing conduct that may constitute breach of fiduciary duty, including failure to make full and complete disclosure of all important information and failure to make reasonable use of confidence that beneficiary has placed in fiduciary).[4]

The appellants now argue that "there was no and/or insufficient evidence produced at trial showing that Smith breached a fiduciary duty owed to Barnes." Specifically, they assert that Barnes "provided no testimony as to how Smith breached his fiduciary duty," and that "Barnes also never stated he was dissatisfied with how the investment funds were spent nor did he state that the investment

---

[4]     The *Anderton* court held:

A fiduciary breaches its duty to its beneficiary if it engages in a transaction with its beneficiary that is not fair and equitable, *Miller* [*v. Miller*], 700 S.W.2d [941,] 947 [(Tex. App.—Dallas 1985, writ ref'd n.r.e.)], if it does not make reasonable use of the confidence the beneficiary has placed in it, id., or if it does not make full and complete disclosure of all important information, *Johnson v. Peckham*, 132 Tex. 148, 120 S.W.2d 786, 787 (Tex.1938). Other factors relevant to fairness include whether the beneficiary had the benefit of independent advice, whether the fiduciary benefited at the beneficiary's expense, and whether the fiduciary significantly benefited from the transaction as viewed in light of circumstances existing at the time of the transaction. *Lee* [*v. Hasson*], 286 S.W.3d [1,] 21 [(Tex. App.—Houston [14th Dist.] 2007, pet. denied]; *Gaynier v. Ginsberg*, 715 S.W.2d 749, 754 (Tex. App.—Dallas 1986, writ ref'd n.r.e.).

*Anderton v. Cawley*, 378 S.W.3d 38, 52 (Tex. App.—Dallas 2012, no pet.)

funds were spent improperly." They argue that Smith's "undisputed testimony" showed that "he ensured funds were spent as was agreed upon by Barnes." This argument misconstrues both the law and the evidence.

The jury charge required Smith to prove that he complied with his fiduciary duties to Barnes by showing the fairness and good faith of his dealings. Smith did not object to this allocation of the burden of proof, and it was apparently based on "a substantial body of authority that certain transactions involving a fiduciary and its beneficiary are presumed unfair and invalid unless the fiduciary proves that the transactions are fair and reasonable." *Anderton*, 378 S.W.3d at 52 (citing *Stephens Cnty. Museum, Inc. v. Swenson*, 517 S.W.2d 257, 260 (Tex. 1974); *Lee v. Hasson*, 286 S.W.3d 1, 20–21 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *Miller v. Miller*, 700 S.W.2d 941, 946–47 (Tex. App.—Dallas 1985, writ ref'd n.r.e.)). The nature of Barnes's position as the beneficiary necessarily meant that he did not have access to information about the businesses unless Smith, as the fiduciary, provided it.

Barnes alleged that Smith breached his fiduciary duty by failing to provide financial information regarding their business as members of K&K Holdings with an interest in the Robert Horry Center's profits; by failing to otherwise recognize Barnes's ownership interest; and by mismanaging business funds to Barnes's detriment. Barnes testified that he did not receive any information about how the

24

money he invested was spent, nor did he ever receive financial information regarding either K&K Holdings or the Robert Horry Center.

Smith testified that approximately $30,000 of Barnes's investment was spent in the failed effort to open a rehab center in Baytown, and the remaining $70,000 was spent on operational costs for the Robert Horry Center, but he provided no financial records to support his testimony. Although he was the person who made business decisions for the Robert Horry Center, he could not provide any detailed information regarding profits and losses or other financial performance for the business. *See Lee*, 286 S.W.3d at 21 (providing that "Texas courts apply a presumption of unfairness to transactions between a fiduciary and a party to whom he owes a duty of disclosure"; further holding that "the profiting fiduciary bears the burden of showing the fairness of the transactions" and "must prove that they acted in good faith and that the transactions were fair, honest, and equitable").

The appellants further argue that Barnes failed to present evidence "showing how he was injured by Smith's breach of fiduciary duty." They argue that the exclusion of Barnes's name from the 2012 Texas Franchise Tax Public Information Report of K&K Holdings did not constitute an injury. As we discussed above, however, Barnes's testimony that he was harmed went beyond the omission of his ownership interest in the 2012 tax document. Barnes testified that he was harmed because he never received a return on his investment or an explanation of the

business's financial situation, despite the fact that the business continued operating and earning income. Smith, as the fiduciary and the party with access to the relevant financial information bore the burden of proving that his dealings with the Robert Horry Center and his managing of the finances was fair, honest, and conducted in good faith. *See id.* Thus, this argument is unavailing.

We overrule the appellants' second issue.

## C.  Fraud Findings

In their third issue, the appellants argue that the evidence is legally and factually insufficient to support the jury's finding that Robert Horry Sports Medicine, LLC, Smith, Patoka, and K&K Holdings were liable for fraud.

The jury was asked, "Did the Defendants commit fraud against Plaintiff Tomur Barnes?" The jury instructions stated that fraud occurs when (1) "a party makes a material misrepresentation"; (2) the misrepresentation "is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion"; (3) the misrepresentation "is made with the intention that it should be acted on by the other party," and (4) the "other party relies on the misrepresentation and thereby suffers injury." The charge further stated that a "misrepresentation" means "[a] false statement of fact" or a "statement of opinion based on a false statement of fact." The court also instructed the jury that

Fraud also occurs when

1. A party fails to disclose a material fact within the knowledge of that party, and

2. The party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, and

3. The party intends to induce the other party to take some action by failing to disclose the fact, and

4. The other party suffers injury as a result of acting without knowledge of the undisclosed fact.

The jury found that "Keith & Kernard Holdings, LLC," "Robert Horry Sports Medicine, LLC," Smith, and Patoka were each liable for fraud against Barnes.

The appellants did not object to this charge. When, as here, the parties have not objected at trial to the substance of the law set forth in the jury charge, we review sufficiency of the evidence in light of the legal standards contained in the charge. *See Osterberg* 12 S.W.3d at 55 ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge."); *Badall v. Durgapersad*, 454 S.W.3d 626, 634 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

### 1.    *Robert Horry Sports Medicine, LLC*

The appellants assert that there is no evidence to support the jury's finding against Robert Horry Sports Medicine because that entity did not exist in October 2011, when Barnes signed the written agreement for his 12% interest in K&K Holdings. They argue that Robert Horry Sports Medicine is a completely separate

entity from the Robert Horry Center or K&K Holdings and that there is no evidence that Robert Horry Sports Medicine was involved in any of the alleged fraud.

The record contained contradictory evidence regarding which companies existed at the time of trial and how those companies were related. Barnes testified that Smith and Patoka made multiple misrepresentations to him regarding the nature of his investment and the relationship between K&K Holdings and the various Robert Horry businesses. Barnes testified that Smith and Patoka had changed the names of their business entities at various times throughout his dealings with them, from "Robert Horry Sports and Rehab Center" to "Robert Horry Center for Physical and Sports Rehabilitation." Barnes further testified that "Robert Horry Sports Medicine" was the name of the entity given to him by Smith and Patoka as part of the underlying litigation. He believed they must have changed the name again.

Patoka testified that they had used different iterations of the name "Robert Horry Sports and Rehabilitation Centers" at various times. Patoka testified that "The Sports and Rehabilitation and Robert Horry Sports and Rehab, they're the same. They perform the same function. They're two separate companies." She further agreed that "they're still the same facilities," clarifying that "The Robert Horry Center for Sports and Rehabilitation and the Robert Horry Sports and

28

Rehab" consisted of the "exact same facilities." She stated that "[a]t one point we opened the other company" after getting "into a relationship with the University General Hospital." She later testified that "Robert Horry Sports Medicine" was an entirely different entity that engaged in a different type of business, doing VIP referrals. The appellants presented evidence that Smith and Patoka created K&K Holdings and the Robert Horry Center in 2010 and that Robert Horry Sports Medicine was subsequently incorporated in 2015. The appellants also acknowledged that all the business entities were owned and operated by Smith and Patoka and bore Robert Horry's name.

The appellants construe this as a sufficiency issue. They moved for a directed verdict on this same ground, asserting that Robert Horry Sports Medicine, LLC "is not a company that was involved in this case" and it "had nothing to do with any of the claims or any of the people in this case regarding the plaintiffs." Barnes responded at trial:

> Well, I would move for a trial amendment, Your Honor, because under the responses to request for disclosure, they never said that we had sued the wrong entity. And that's why you have the request for disclosure. If they had disclosed it at the time, we would have just added the correct entity but they never did that. That was the entity we found and that's the one we included. There wasn't any intention to draw someone in that wasn't actually involved in the lawsuit. So obviously we would move for a trial amendment to add the entities that were actually involved.

The trial court stated, "I think based on the testimony that the names have changed of the client, so it's denied on that." Thus, rather than allowing Barnes a trial amendment to ensure that his pleadings and the jury charge correctly reflected the name of the particular Robert Horry entity involved in this case,[5] the trial court determined that the appellants had changed the names of the entities involved and that "Robert Horry Sports Medicine" was sufficiently related to Barnes's claim to be submitted to the jury.

The evidence that Robert Horry Sports Medicine was associated with the same owners and officers as the other Robert Horry entities, together with Barnes's testimony that Patoka had told him that they had changed the name of the business, was legally sufficient evidence to support the jury's finding that Smith's and Patoka's fraudulent representations were made, at least in part, on behalf of and for the benefit of their business entity Robert Horry Sports Medicine. *See City of Keller*, 168 S.W.3d at 819, 827. And, in light of the evidence that Smith and

---

[5]     Trial amendments are governed by Texas Rule of Civil Procedure 66, which provides that the court may allow amendments to a pleading and shall do so when the amendment would serve the presentation of the merits without prejudicing the opposing party's action or defense on the merits. TEX. R. CIV. P. 66. "Under the rule, a trial court has no discretion to refuse a trial amendment unless: (1) the opposing party presents evidence of surprise or prejudice, or (2) the amendment is prejudicial on its face because it asserts a new cause of action or defense, and the opposing party objects to the amendment." *Tanglewood Homes Ass'n, Inc. v. Feldman*, 436 S.W.3d 48, 64 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Trial amendments that are procedural in nature, such as conforming the pleadings to the evidence at trial, are mandatory. *Id.* Substantive amendments or those that change the nature of the trial are discretionary, and the court's decision to allow or deny them may be reversed only if the court clearly abused its discretion. *Id.*

Patoka were inconsistent in how they referred to their various Robert Horry business enterprises, we cannot say that the jury's findings against Robert Horry Sports Medicine was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176; *Republic Petroleum*, 474 S.W.3d at 433.

We overrule the appellant's complaints on this ground.

2.  *Smith and Patoka*

The appellants argue that there was insufficient evidence to support the jury's finding of fraud against Patoka and Smith in their individual capacities.

Barnes testified that both Smith and Patoka represented to him that, in return for his $100,000 investment, he would be entitled to 12% of the profits from the Robert Horry Center. When they presented him the written agreement in October 2011, he learned for the first time that K&K Holdings was the holding company for the Robert Horry Center. He testified that Smith and Patoka both told him that K&K Holdings owned the entire interest in the Robert Horry Center, and thus, he believed he was still investing in the rehab center and that he would be entitled to 12% of that entity's profits. Barnes further testified that, prior to making his investment, Smith and Patoka told him about the facility and operations at the Robert Horry Center, they showed him the Sugar Land facility, and discussed plans for expanding to other locations. Barnes testified that, had he known he was

31

investing $100,000 in exchange for only 12% of 15% of the Robert Horry Center's profits, he would not have made the investment.

Furthermore, the written agreement that Barnes signed in October 2011 stated only that he had a 12% interest in K&K Holdings. It did not provide any information regarding K&K Holdings' rights to the Robert Horry Center's profits or otherwise describe the relationship between those entities. Patoka and Smith both testified that they consistently told Barnes that K&K Holdings was entitled to 15% of the Robert Horry Center's profits and that he was purchasing a 12% interest, but when questioned at trial, Patoka could not identify any document setting out those facts or conveying that information to Barnes.

The jury could have credited Barnes's testimony in concluding that Smith and Patoka failed to disclose a material fact within their knowledge—i.e., the exact nature of K&K Holdings' interest in the Robert Horry Center—and that they knew Barnes was ignorant of that same information and did not have an equal opportunity to discover the truth, they intended to induce him to invest by failing to disclose the limited nature of his right to future profits, and Barnes was injured when he invested $100,000. *See City of Keller*, 168 S.W.3d at 819; *Republic Petroleum*, 474 S.W.3d at 433.

Smith and Patoka's testimony provided some contrary evidence. They both testified that they fully disclosed the nature of the relationship between K&K

32

Holdings and the Robert Horry Center and that they fully informed Barnes that his investment was high risk and his right to future profits was limited to 12% of K&K Holdings' 15% interest in the rehab center's profits. However, jurors are entitled to resolve inconsistencies in witness testimony, whether those inconsistencies result from the contradictory accounts of multiple witnesses or from internal contradictions in the testimony of a single witness. *See McGalliard*, 722 S.W.2d at 697; *Republic Petroleum*, 474 S.W.3d at 433. The jury was thus entitled to find Barnes's testimony more credible and to accord more weight to his testimony. *See City of Keller*, 168 S.W.3d at 819; *Republic Petroleum*, 474 S.W.3d at 433.

Smith and Patoka also argue that Barnes "failed to produce any evidence at trial showing that he was injured because his investment was placed in K&K Holdings instead of [the Robert Horry Center]." Barnes testified, however, that he would not have invested his money at all had he realized the limited nature of his rights to future profits, and he testified that he never recovered any of the money he had invested. The evidence further showed that, despite the fact that the Robert Horry Center never reported any profits to Barnes, the business nevertheless earned enough income to pay Smith and Patoka salaries as the managers of the center, and they paid fees to Horry so that they could continue to use his name. The jury could credit this testimony in concluding that Barnes was harmed by Smith

33

and Patoka's fraud. *See City of Keller*, 168 S.W.3d at 819; *Republic Petroleum*, 474 S.W.3d at 433.

Finally, Smith and Patoka assert that Barnes failed to present any evidence that they made any misrepresentations to him "outside of their official capacity as company officers" of K&K Holdings and the Robert Horry Center. They argue that Barnes was "required to produce evidence at trial that Smith and Patoka were alter egos of K&K Holding and [the Robert Horry Center]" and that "they perpetrated an actual fraud for their personal benefit to avoid paying Barnes a return on the $100,000 investment he made." The appellants failed to object to the jury charge on this ground, however, and no such instruction was offered during the charge conference. We measure the sufficiency of the evidence against the unobjected-to charge. *See Osterberg*, 12 S.W.3d at 55; *Badall*, 454 S.W.3d at 634.

We further observe that there was evidence that a jury could have credited in concluding that Smith and Patoka received a personal benefit from defrauding Barnes into investing $100,000. They both testified that they needed the infusion of cash from investors like Barnes to keep the Robert Horry Center—a business for which they were the owners—afloat. They further testified that the bulk of Barnes's investment went into "operational costs" of the Robert Horry Center, and they testified that they received salaries for their work in managing the rehab. They agreed that they were the sole managers and the only people with the authority to

34

determine how the business spent the money it earned, which Smith testified averaged between $30,000 and $45,000 a month.

We overrule the appellant's complaint on this ground.

### 3. K&K Holdings

The appellants argue that Barnes failed to produce legally sufficient evidence that "the element of injury was satisfied in his fraud claim against K&K Holdings." They assert, "It is undisputed that Smith and Patoka were the only officers and agents of K&K Holdings who made representations to Barnes," and Barnes failed to show that he was harmed because he failed to produce evidence "that he would have been in a better position if his investment funds had been placed in [the Robert Horry Center] instead of K&K Holdings."

Corporations can only act through individuals. *Tri v. J.T.T.*, 162 S.W.3d 522, 562 (Tex. 2005). Smith and Patoka both testified that they decided together to create both the Robert Horry Center and K&K Holdings, that they were owners and officers of both companies, and that they were the only people with authority to make decisions on behalf of the entities. Thus, the evidence outlined above as supporting the jury's findings against Smith and Patoka, individually, are likewise sufficient to support the jury's finding against K&K Holdings.

We overrule the appellants' third issue.

## D. Lost profits

In their fourth issue, the appellants argue that the evidence is legally and factually insufficient to support the jury's finding that Barnes incurred $250,000 in past lost profits and $250,000 in future lost profits.

The jury charge asked the jury, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Tomur Barnes for his damages, if any, that resulted from such fraud and/or breach of fiduciary duty?" The jury was instructed to consider only "[l]ost profits that were a natural, probable, and foreseeable consequence of such fraud." The jury awarded $250,000 for "lost profits sustained in the past," and $250,000 for "lost profits that, in reasonable probability, will be sustained in the future."

The appellants argue that "no expert nor fact witness testified about a lost profit or estimate of a loss with reasonable certainty or the cause of lost profits," and "no fact witness gave an opinion or estimate of net profits for K&K Holdings or RH Sports Medicine." And they argue that Barnes was required to "do more than show that [he] suffered some lost profits."

We observe, however, that Barnes sought damages for fraud and breach of fiduciary duty—not for breach of an investment agreement. He argued, at least in part, that because of the appellants' fraud and breach of fiduciary duty, he was not provided with financial information regarding his investment. And, in fact, at trial

36

neither Smith nor Patoka could provide detailed financial information regarding the financial condition of either the Robert Horry Center or K&K Holdings.

"Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the bargain measure." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (quoting *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998)). The former "derive[s] from a restitutionary theory" while the latter "derive[s] from an expectancy theory." *Id.*; *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007). "Out-of-pocket damages are measured by the difference between the value expended versus the value received, thus allowing the injured party to recover based on the actual injury suffered." *Zorilla*, 469 S.W.3d at 153 (citing *Formosa Plastics*, 960 S.W.2d at 49). "Benefit-of-the bargain damages are measured by the difference between the value as represented and the value received, allowing the injured party to recover profits that would have been made had the bargain been performed as promised." *Id*. at 49–50.

Thus, the "lost profits" in this case does not refer to the profits of the Robert Horry Center or K&K Holdings, but to the difference between the value of Barnes's investment as represented and the value he actually received. *See id.* Stated another way, it refers to the value that Barnes would have received from his investment had the parties performed as they represented that they would. *See id.*

37

While the actual profits earned by the Robert Horry Center are relevant to calculating Barnes's fraud damages, that is not the entire enquiry. The jury was presented with evidence that Smith and Patoka, as the sole owners and managers of the Robert Horry Center, received income from the business and paid themselves salaries, but did not make any accounting for these payments to their business investor, Barnes. Patoka further testified that the company generated different reports and profit and loss statements, depending on the purpose for which they would be used. And neither Smith nor Patoka could provide basic financial information despite their roles as owners, officers, and managers of the companies involved. This was evidence that the jury could have relied on in determining that Smith and Patoka were not credible when they testified that the Robert Horry Center had not earned any profits in the seven years since Barnes had invested. *See City of Keller*, 168 S.W.3d at 819 (holding that we defer to jury's determination witnesses' credibility and weight to accord their testimony).

Furthermore, despite the appellants' failure to provide the requested financial information for the Robert Horry Center and K&K Holdings, there was evidence of objective facts, figures, and data from which the jury could ascertain Barnes's damages. *See Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 859–60 (Tex. 2017) (discussing degree of proof necessary to support amount of lost profits and holding that, although party's "bare assertion that a

38

contract was lost does not establish lost profits with reasonable certainty," plaintiff may recover lost profits "where it is shown that a loss of profits is the natural and probable consequence of the act or omission complained of, and their amount is shown with sufficient certainty"). The evidence demonstrated that the Robert Horry Center earned income. Both Smith and Patoka testified that the business continued to operate and receive payments from clients. Smith testified, for example, that the rehab center's income averaged between $30,000 and $45,000 a month, and, thus, the Robert Horry Center earned income of between $360,000 and $540,000 per year, totaling between $2,520,000 and $3,780,000 for the seven-year period following Barnes's investment. The jury could have credited this portion of Smith's testimony establishing the business's earnings and, at the same time, discredit his testimony that this income did not indicate the amount of profit the business had earned. *See McGalliard*, 722 S.W.2d at 697 (recognizing that jurors may resolve inconsistencies in witness testimony, including inconsistencies in internal contradictions in testimony of single witness); *Republic Petroleum*, 474 S.W.3d at 433.

The jury's award of $250,000 for past damages covered a period of approximately seven years—from October 2011, when Barnes invested in the business, through trial in October 2018. Thus, the jury's verdict indicated that it believed Barnes's investment—which he was told entitled him to 12% of the

Robert Horry Center's profits—should have yielded him approximately $35,000 for each year that he had invested if the parties had performed as they represented they would. And the jury's award of $250,000 for money that Barnes, in reasonable probability, would have made in the future had the parties performed as represented, is consistent with the testimony that the Robert Horry Center would continue to operate by seeing clients and earning income. Smith and Patoka both testified that they hoped the business would continue to function for many years into the future, and they testified that they anticipated increased revenues in the future.

To the extent that the appellants argue that the evidence is insufficient because Barnes failed to provide expert testimony regarding the value of his investment, we observe that they did not cite any authority that expert testimony is necessary in cases like this, nor could we find any. To the contrary, courts have held that expert testimony is not required to prove lost profits and have instead recognized that a property owner is generally qualified to testify to the value of his property even if he is not an expert. *E.g.*, *Sharifi v. Steen Automotive, LLC*, 370 S.W.3d 126, 150 (Tex. App.—Dallas 2012, no pet.) (citing *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 852–53 (Tex. 2011)). "The owner of a business is likewise permitted to testify as to its value, if he has a basis of knowledge of the value of the business." *Id.*; *Ramex Constr. Co.*

*v. Tamcon Servs., Inc.*, 29 S.W.3d 135, 138 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *accord Laprade v. Laprade*, 784 S.W.2d 490, 492–93 (Tex. App.—Fort Worth 1990, writ denied); *Tyre v. Yawn*, No. 01–08–00914–CV, 2011 WL 662957, at *7 (Tex. App.—Houston [1st Dist.] Feb. 17, 2011, no pet.) (mem. op.). Smith testified that he was the owner and manager of the Robert Horry Center, and Patoka likewise testified that Smith was the one who managed "the business side of things." Thus, Smith's testimony, brief though it was, is sufficient evidence of the center's income such that the jury could have relied on his testimony in determining Barnes's damages for fraud and breach of fiduciary duty.

We overrule the appellant's fourth issue.

## Punitive Damages

In their fifth issue, the appellants argue that the punitive damages award must be reversed. They argue that there was no predicate finding of gross negligence to support the award of punitive damages and that Barnes did not present clear and convincing evidence of gross negligence.

Regarding exemplary damages, the jury was instructed to answer the exemplary damages question only if it "unanimously answered 'Yes' to [the fraud question] regarding that defendant" and that it "must unanimously agree on the amount of any award of exemplary damages." The charge asked the jury what sum of money should be assessed against each defendant as exemplary damages for the

41

fraud. The charge instructed the jury that "exemplary damages" means "an amount that you may, in your discretion, award as a penalty or by way of punishment" and provided a list of factors to consider, such as "the nature of the wrong," the "character of the conduct involved," the "degree of culpability of the Defendants," the "situation and sensibilities of the parties concerned," the extent to which the conduct "offends a public sense of justice and propriety" and "the next worth of Defendants." The jury awarded $50,000 against K&K Holdings, $150,000 against Smith, and $150,000 against Patoka.

We first observe that a finding of gross negligence is not required in this context. Civil Practice and Remedies Code section 41.003 provides that "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence." TEX. CIV. PRAC. & REM. CODE § 41.003(a). The jury did make a unanimous predicate finding of fraud here; therefore, the appellants' reliance on authorities requiring proof of gross negligence are misplaced. *See id.*

We further observe that the appellants did not object to the exemplary damages question or ask that the jury be given a "clear and convincing" instruction. Any complaint regarding a defect in a jury question, definition, or instruction is waived unless specifically included in the objections to the charge.

42

*See* TEX. R. CIV. P. 278; *see also Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007) (stating party's failure to object to charge and instruction waived any error, meaning that measure of damages was as provided by question and instruction given).

Viewing the evidence in light of the jury charge's instruction on exemplary damages, we conclude that there was sufficient evidence to support the jury's award. With respect to an exemplary damages award, "we conduct a legal sufficiency review under the 'clear and convincing' evidence standard." *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 109 (Tex. App—Houston [14th Dist.] 2013, pet. denied). "'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. CIV. PRAC. & REM. CODE § 41.001(2). We examine all evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Soon Phat*, 396 S.W.3d at 109. We assume that the fact finder resolved any disputed facts in favor of its finding if a reasonable fact finder could have done so; we also disregard all evidence that a reasonable fact finder could have disbelieved. *In re J.F.C.*, 96 S.W.3d 256, 265 (Tex. 2002); *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 483 (Tex. App.—Fort Worth 2004, no pet.). Our review of factual sufficiency of the evidence under a

43

clear and convincing standard requires us to determine based on the record whether the fact finder reasonably could form a firm conviction or belief that the allegations were proven. *Citizens Nat'l Bank*, 142 S.W.3d at 483.

Barnes testified that Smith and Patoka led him to believe that he was investing in the Robert Horry Center, when in reality he received only a fraction of an interest in that entity through a holding company. Smith and Patoka acknowledged that, beginning in 2016, they met with Barnes and his attorney to discuss Barnes's investment and the financial situation of the companies, but they nevertheless failed to provide any information regarding the financial condition of the business, continually testifying that they could not recall amounts. Even during the trial, Smith and Patoka continued to obscure material information regarding the financial condition of the businesses by testifying that they did not know any specific amounts for income or expenses. They both testified that the Robert Horry Center remained operational and saw clients and that the business made sufficient money to pay salaries to both Smith and Patoka as managers, but they could not recall how much money they had paid themselves over the years. This is evidence from which the jury could have formed a firm belief or conviction that its findings were true.

We overrule the appellants' fifth issue.

**Conclusion**

We affirm the judgment of the trial court.

Richard Hightower
Justice

Panel consists of Chief Justice Radack and Justices Hightower and Adams.